OSBORN v. OSBORN ET AL.

(No. 760264—Decided June 24, 1966.)

Common Pleas Court of Cuyahoga County.

*Messrs. Jones, Day, Cockley & Reavis, Mr. Ellis H. McKay, Mr. Alexander Ginn, Mr. Marc L. Swartzbaugh* and *Mr. Nelson P. Rose*, for plaintiff.

*Messrs. Arter, Hadden, Wykoff & Van Duzer, Mr. Sumner Canary, Mr. Robert B. Preston* and *Mr. Edward S. Merrick*, for defendants.

*Mr. Robert Biechle*, for The Cleveland Trust Company.

CORRIGAN, J.  In this matter the plaintiff asks that the court vacate, set aside and hold for naught an antenuptial agreement executed by her and her deceased husband, Henry C. Osborn, on August 1, 1955; that she be restored to her legal rights as surviving spouse of said Henry C. Osborn, deceased; that the court adjudge and decree that, by reason of Henry C. Osborn's retention of dominion over the property in the Henry C. Osborn Trust to the time of his death, plaintiff is entitled to take her distributive share under Section 2105.06, Revised Code, in the property included within said trust as well as in the net estate of Henry C. Osborn, deceased.

Before plunging into a discussion of all the issues involved the court lists the following statements of fact, which were substantially agreed to by and between counsel during the course of the trial.  Henry C. Osborn died testate on May 3, 1961, a resident of Cuyahoga County, leaving plaintiff as his surviving spouse.  His last will and testament, executed on March 4, 1955, was admitted to probate in Case No. 608836 of the Probate Court of this county on May 23, 1961.  Defendant, Henry C. Osborn, Jr., is the duly appointed, qualified and acting executor of the estate.  Defendant, The Cleveland Trust Company, is Trustee of the Henry C. Osborn Trust originally established March 8, 1920, and modified from time to time with the last modification dated March 5, 1955, and hereinafter called the "No. 1 Trust."

At the death of Henry C. Osborn on May 3, 1961, his only children, two sons, Henry C. Osborn, Jr., and Tracy K. Osborn were then living, although the latter died on May 18, 1961, survived by no spouse or issue. Henry C. Osborn, Jr., then is the only living child, is a beneficiary under his will, the sole income beneficiary under the No. 1 Trust, and the father of four living children.

Neither the will nor the No. 1 Trust made any provision for the plaintiff or any issue of hers, four living adult children. In July 1961, plaintiff as surviving spouse duly elected, pursuant to Section 2107.39, Revised Code, to take against the will and take her distributive share under Section 2105.06, Revised Code.

On August 1, 1955, plaintiff and Henry C. Osborn, then being 54 and 77 years of age respectively, executed at Marion,

Massachusetts, an antenuptial agreement which had been drafted in February 1955, by counsel for Henry C. Osborn in Cleveland, Ohio. It was ultimately signed in the same form except for the date and plaintiff's name which were added in ink at or about the time of its execution, following a discussion of the agreement between the parties and a Massachusetts attorney, a friend of plaintiff's family who was later compensated by Henry C. Osborn. The marriage took place at Marion, Massachusetts, on August 27, 1955.

Henry C. Osborn was a lifelong resident of Cleveland, Ohio, with a summer home in Marion, Massachusetts and a winter place in Sarasota, Florida. Plaintiff was born in Colorado, resided in Ohio from 1907 to 1923; in Illinois from 1923 to 1927; in Massachusetts from 1927 to 1941; in Cleveland, Ohio from 1941 to 1947; and back to Massachusetts from 1947 to 1955. Her first husband, Millar Brainard, died in 1953. At the time of the execution of the antenuptial agreement and at the time the marriage to Henry C. Osborn she was a resident of Marion, Massachusetts. Subsequent to the marriage their residence was 11101 Magnolia Drive, Cleveland, Ohio.

As of August 1, and August 27, 1955, plaintiff had life income and control of a revocable trust theretofore established by her and having its situs in Massachusetts, of the value of $165,600. At those dates her total assets, excluding the property carried in the trust, had a net value of $75,000. On the same dates she had four living children.

As of August 1, and August 27, 1955, the No. 1 Trust was in effect and the property carried therein had a net value of $2,615,640, of which amount $1,657,500, consisted of common stock of Addressograph-Multigraph Corporation with a cost basis of $185,256. Henry C. Osborn was an officer and a director of that corporation and at these dates his total assets, excluding property carried in the No. 1 Trust, had a net value of $100,000. On the same dates he had two living children.

From August 1, 1955, until his death on May 3, 1961, the property carried in the No. 1 Trust and the income therefrom comprised Mr. Osborn's sole source of funds for payment of living expenses and other obligations, except salary, pension and director's fees from Addressograph-Multigraph, totaling $26,962, and statutory social security benefits,

174

On December 15, 1955, Henry C. Osborn established with The Cleveland Trust Company as trustee a trust providing certain benefits for the plaintiff, hereinafter called the "No. 4 Trust." The initial corpus of said trust consisted of securities previously carried in the No. 1 Trust of the value of $218,900. Although he retained the right to revoke or modify during his lifetime, except for a modification doubling the income to his wife on January 31, 1956, the No. 4 Trust was not modified or revoked and at his death became irrevocable. Between the final establishment of the No. 4 Trust on December 15, 1955, and his death on May 3, 1961, plaintiff received all of the net income totaling $51,546. At the death of Henry C. Osborn, the No. 4 Trust was in full effect and was valued at $634,762. Under the terms of the No. 4 Trust, plaintiff has a testamentary power of appointment thereof, which power she has exercised. At no time was Henry C. Osborn or any issue of his designated a beneficiary under plaintiff's will.

In March 1956, Henry C. Osborn purchased a residence in Sarasota, Florida, for a consideration of $53,000. Title was taken in the name of plaintiff and Mr. Osborn as tenants by the entirety, and at his death the entire title vested in plaintiff. In March 1961, he purchased an adjoining unimproved lot for $13,200. Title to this lot, which has remained unimproved, was likewise taken in the name of the plaintiff.

At the outset of the trial counsel for defendants renewed his motion previously overruled by the court that the plaintiff be required to separately state and number the causes of action contained in her petition. In support of the motion, counsel argued that the petition states three separate and distinct causes of action. One is the action to set aside the antenuptial agreement on the ground it was void at its inception; one is the action to set aside the agreement on the ground it was voidable; and the third is the action which seeks to give plaintiff the right to invade the corpus of the trusts, which were created during Henry C. Osborn's lifetime. Counsel for plaintiff countered with the argument that the petition states a single cause of action relating solely to the establishment of the property rights which plaintiff may have as surviving spouse, by a single means—judicially setting aside the antenuptial agreement and establishing those rights. After extended discussion, while conceding that the petition raised multiple issues and that it was

essential to plaintiff's case that she prevail on the issue of nullifying the antenuptial agreement in order to achieve her objective—participation in the disposition of the decedent's assets as surviving spouse, this court nevertheless denied defendants' motion. The court viewed the lawsuit as an attempt to set aside the agreement which would result in restoring her to the full rights of a surviving spouse entitled to her distributive share, both in the probate estate and in the trusts which she alleges should be included in the assets to be administered within the estate.

Basically the two issues in this case concern the validity of the antenuptial agreement and the validity of the No. 1 Trust created by Henry C. Osborn on March 8, 1920. Plaintiff claims that her rights on all issues in this case must be determined in accordance with Ohio law, while the defendants argue that the validity of the antenuptial agreement is a question of Massachusetts law, but is likewise binding on the parties under the law of Ohio. The plaintiff relies principally on *Juhasz* v. *Juhasz*, 134 Ohio St. 257, which they contend under circumstances present in this case requires a defendant to offer proof that there was a disclosure of the nature, extent, and value of the assets of the parties to an antenuptial contract. Counsel for defendants assert that under Massachusetts law, *Wellington* v. *Rugg*, 243 Mass. 30, 136 N. E. 831, no such disclosure of assets is required.

The pertinent syllabi in *Juhasz, supra,* reads:

2. An antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the wife is fair and reasonable under all the surrounding facts and circumstances.

3. When the amount provided for the wife in an antenuptial contract entered into during the existence of the confidential relation arising from an engagement is wholly disproportionate to the property of the prospective husband in the light of all the surrounding circumstances and to the amount she would take under the law, the burden is on those claiming the validity of the contract to show that before it was entered into he made full disclosure to her of the nature, extent and value of his property or that she then had full knowledge thereof without such disclosure.

In *Wellington* v. *Rugg, supra,* the Massachusetts court held :

The failure on his part to inform her of what he owned falls far short of fraudulent concealment. So far as appears had she so wished she could have made inquiry of him, and also could have made such investigation as she saw fit before making the contract. Notwithstanding the confidential relations between the parties, the simple failure voluntarily to disclose the amount of his property does not constitute actionable fraud.

The validity of a contract where a conflict of laws question arises is to be determined either by the law of the state of execution or by the law of the state of performance, or stated in plainer language, the place of making or the place of performance. The antenuptial agreement here in question was for the mutual benefit of both parties. The agreement permitted the plaintiff and Henry C. Osborn to dispose of their individual assets acquired over the years to their respective children without a consideration of the statutory rights of the new spouse. We must assume that both parties acted in good faith and desired to have a valid document. Defendants argue that the intention of the parties was to have the law of Massachusetts apply because they consulted a Massachusetts lawyer, signed the agreement and were actually married there. Counsel for plaintiff contend that the agreement was drawn by Ohio lawyers, referred to "Ohio" law before "Massachusetts" in the language, and was fully intended to be performed in this state because Cleveland was to be their marital domicile.

Under Ohio conflict of laws principles, generally, questions relating to the validity of a contract are governed by the law of the place of performance rather than the place of making. The Supreme Court wrote in *Montana Coal & Coke Co.* v. *Cincinnati Coal & Coke Co.*, 69 Ohio St. at page 357:

"* * * This court has already committed itself to the doctrine that 'a contract made in one state or country to be performed in another, is governed by the laws of the latter which determine its validity, obligation and effect.' * * * This rule is so well established upon reason and authority that it requires no discussion here. * * *."

It would appear that Ohio follows a developing conflict of laws principle being advanced by the American Law Institute which advocates putting more emphasis upon the intention of the parties and other additional factors designed to apply the

law that has the most substantial contacts with the agreement in question.

As suggested in plaintiff's brief, there is no field of law with which the state is more intimately concerned, or has a greater interest than in marital relations and property rights of married persons living within that state. The state is concerned in seeing that its concepts of public safety are enforced in this area because marriage is a status exclusively regulated and controlled by the laws of the state of the parties' matrimonial domicile. 35 Ohio Jurisprudence 2d, Marriage, Section 9 (1959).

Clearly, the domicile involved here was in Ohio and the parties remained domiciled in Cleveland until Mr. Osborn's death. His will was probated here and the estate is being administered in Cuyahoga County. The agreement altered substantially the rights they would otherwise have had by law in their respective properties. The action has been brought in Ohio against Ohio defendants by the plaintiff to seek her rights as an Ohio surviving spouse under Ohio statutes in Ohio property. There can be little question that Ohio has the most significant contacts with and paramount interest in the parties, in the agreement, and in questions concerning its validity.

In view of this conclusion it is incumbent upon the court to determine the validity of the antenuptial agreement under Ohio law dealing with this subject. The only statute in Ohio referring to such agreements, Section 2131.03, Revised Code, requires that an action seeking an invalidation must be commenced within six months of the appointment of the executor or administrator of the estate, but it has no applicability to the present matter. The general validity and construction of antenuptial contracts is summarized in 28 Ohio Jurisprudence 2d, Husband and Wife, beginning at page 194:

Section 72. A prospective husband and wife may enter into a valid antenuptial contract with respect to the rights of each in the property of the other. Antenuptial contracts have long been regarded as within the policy of the law, since they are in favor of marriage and tend to promote domestic happiness by removing one of the frequent causes of family disputes —contentions about property and allowances to the wife. Hence an antenuptial contract is prima facie, valid and binding.

It is generally recognized that an antenuptial agreement in which there is a mutual relinquishment of their respective interests in each other's estate is supported by two valuable considerations, namely, the marriage and the relinquishment of their mutual rights. Further the provisions, if fair, reasonable, and just, as between the parties, in view of all the circumstances of the case, will be recognized and upheld in equity. The courts scrutinize such agreements to ascertain whether the parties fully understood the nature and terms of the agreement, the property possessed by each, and their rights in the premises, and whether any improper advantage was taken of either to induce the making of the contract. However, if the value of the property given to the wife is disproportionate to the amount which she would receive at law as the widow or if it is proven that she is ignorant of the extent of his property, the agreement may be set aside as obviously unjust.

In many cases where the widow seeks to set aside the antenuptial agreement the argument is advanced that she was uninformed, passive in the execution of the agreement and totally ignorant of its effect. In the first reported Ohio Supreme Court case dealing with such an agreement, *Stilley* v. *Folger*, 14 Ohio 610, at page 648, the court wrote the following:

"* * * and it must be admitted that without explanation, they are well calculated to awaken the suspicions of the chancellor, and perhaps lead him to doubt the fairness and integrity of this antenuptial agreement. If his suspicions were not removed, he would doubtless hold his soliloquy in language identical with the counsel in the case at bar: 'What person so exposed to imposition as a woman, contracting, personally, with her intended husband, just on the eve of marriage, at a time when all prudential considerations are likely to be merged in a confiding attachment, or suppressed from an honorable instinct and sentiment of delicacy.' Surely, 'it would be a reproach to the law, if the very virtues and graces of woman were thus allowed to become the successful means of overreaching and defrauding them in bargains.'

"It must, nevertheless, be admitted, that the conscience of the chancellor, though touched with sentiment so delicate, would hardly stand excused, should investigation cease, relief be decreed, and not even a glance cast nor a thought bestowed on the other side of this picture."

These words of Chief Justice Wood penned about one hundred and twenty years ago when women had not achieved the status they have today are good advice to any judge called upon to determine the validity of an antenuptial agreement. In effect, he suggested, be chivalrous but be circumspect, remembering that every case must be determined on its own particular facts and equities. After a thorough review of all the citations bearing on this problem this court is convinced that the antenuptial agreement between the late Henry C. Osborn and Katharine R. Brainard must be viewed in the light of all the known facts and surrounding circumstances.

Counsel for the plaintiff would simplify this problem facing the court by relying on the *Juhasz case*, quoted earlier, while defendants' attorneys deny it has any application to the facts herein. The latter, in turn, point to the answer which they claim is to be found in the syllabus of *Troha* v. *Sneller, Admx.*, 169 Ohio St. 397:

"An adult man and woman, each owning a substantial amount of property and each having grown children by prior marriages, may lawfully enter into a prenuptial agreement whereby each relinquishes every and all rights in the property of the other, and, where such an agreement is duly executed, the parties subsequently marry and thereafter the husband dies, the widow is barred from any part of his estate, including special benefits conferred on the widow by statute and the privilege of administering the estate, where the agreement by its clear wording shows that such a result was intended."

The plaintiff's counsel counters that since there are "crucial differences between *Troha* (equal estates, no disclosure issue) and *Osborn* (wife's property 1/11 of husband's, no disclosure)" the *Troha case* simply has no application here. In the *Troha case* the Supreme Court made no reference to the *Juhasz case* or any of the points set forth therein. However, the Court of Appeals in *Herman* v. *Soal, Exr.*, 71 Ohio App. 310 (motion to certify overruled January 13, 1943) said:

"* * * In the *Juhasz case*, what evidently shocked the court, as will later appear, was the disparity between the amount received by the wife and the value of the entire estate of her husband. In the instant case, the question of disparity in such sense is not involved, for the plaintiff husband agreed to take *nothing* out of the wife's estate and she agreed likewise," and,

also, at page 316: "* * * Again, it is worth repeating, each agreed to take *nothing* out of the estate of the other. How can nothing be disproportionate to any amount?"

It is significant that in every case which appears to follow the broad rule followed in *Juhasz*, there was some allowance made for the spouse. Once again in referring to this case, in *Herman* v. *Soal*, the court said at page 314:

"* * * It would appear, therefore, that the Supreme Court was considering a case where definite and designed advantage was taken of a woman under circumstances that to all intents and purposes amounted to fraud.

In reviewing all the evidence offered herein, this court finds no evidence of fraud. The language of the antenuptial agreement is clear and unequivocal:

"* * * each of said parties shall have, hold and maintain his or her separate control, ownership and disposition of said property owned by each of them respectively * * * as if said marriage had not occurred; that neither of the parties hereto shall acquire by virtue of said marriage any ownership or right or control in or to the property of the other during coverture between them nor the right of inheritance in the property of the other by the survivor of them; that each of the parties hereto may make such disposition of his or her property, by gift or by will, during his or her lifetime as he or she sees fit * * * the survivor shall have and take no interest in the property or the estate of the party deceased as he or she might lawfully do had not this agreement been made * * * and the property of such deceased party shall immediately pass to and vest in the lawful heirs of said deceased party exclusive of such surviving spouse.

Clearly the evidence does not reveal that any definite and designed advantage was taken of the plaintiff in any respect. Contrary to the situation in *Juhasz* where Mr. Juhasz's attorney discussed the agreement with Mary Kenyo, "who didn't speak English well," through an interpreter, the plaintiff spoke with the Massachusetts attorney whom she called. She discussed with him privately the purpose of the conference scheduled between the attorney, Mr. Osborn, and herself. Later the three of them met and the proposed agreement was read aloud. Attorney W. James McDonald's testimony, in part, reads as follows:

"A. We did discuss the provisions of the document and specific language in the document, but I don't recall whether it was a matter of questions from either Mr. Osborn or Mrs. Brainard. However, my memorandum of August 2 says they asked questions; they each asked questions."

Further the record reflects the fact that the first meeting took place on July 26, 1955, when the attorney was asked to review the proposed agreement and later "supervise the execution of the document." Mr. McDonald also revealed that "Mr. Osborn told me that at the time that he handed me the unexecuted antenuptial agreement that he intended to establish an inter vivos trust for the benefit of Mrs. Brainard with the Cleveland Trust Company as trustee." Most of the discussion about the proposed trust was had outside of plaintiff's presence but the witness stated that "my recollection is that Mrs. Brainard knew that the proposed trust was to provide a life income of $500 a month for her benefit."

It is to be noted that the said trust was finally established by Mr. Osborn in December 1955 giving her full power over it at the time of his death. It was modified less than a month later increasing the monthly benefit to $1,000 a month. During the five years and ten months of the marriage she received all of the net income in the amount of $51,546. At his death on May 3, 1961, the trust was in full effect and valued at $634,762. Property in Sarasota, Florida, purchased by Mr. Osborn, with title now in plaintiff's name had a valuation of $66,200. Income from the trust established for her, distributable to the plaintiff from the date of Mr. Osborn's death through December 31, 1965, amounted to $97,254. She has received approximately $848,000 and can expect an annual income of approximately $20,000 from the trust over which she has full testamentary power of appointment. She is not required under the antenuptial agreement to allocate anything for the benefit of Mr. Osborn's heirs.

When we consider that Henry C. Osborn was at the time of the marriage, seventy-seven years of age; that from his advanced age, the coverture must have been expected to be of short duration; that plaintiff, at fifty-four years of age had been acquainted with Mr. Osborn for many years as a friend. both in Cleveland and in Massachusetts and knew of his prominent business connection; that she had real estate and a prior

separate trust and income of her own which she kept for herself, free from Mr. Osborn's control, although evidence reveals he paid the taxes thereon; that she contributed absolutely nothing to the Henry C. Osborn Trust erected in 1920, nor anything to the assets acquired during the marriage; that she was represented by counsel in other litigation and in this matter who reviewed and discussed with her the details of the agreement and answered her questions; and that she was not confused with any fractional share situation since she agreed to take nothing, we find it difficult to conclude that, this alert, competent and composed woman was victimized and defrauded by a crafty old scoundrel.

After a careful review of the evidence and a thorough consideration of the law we feel constrained to re-echo in stentorian tones the language found in the *Troha case* at page 402:

"We know of no public policy in Ohio and no statutory enactments or court decisions which prevent the parties to a prenuptial agreement, situated [here as were Henry Osborn and Katharine] * * *, from cutting one another off entirely from any participation in the estate of the other upon the death of either."

The principles to be applied in determining the validity of this antenuptial agreement can be found in both the *Juhasz* and *Troha cases* which provide that "the antenuptial contract must be voluntarily entered into and the provisions for the wife must be fair and reasonable under all the surrounding facts and circumstances" and that "an adult man and woman, each owning a substantial amount of property and each having grown children by prior marriages, may lawfully enter a prenuptial agreement whereby each relinquishes every and all rights in the property of the other."

Accordingly, the court holds that the antenuptial agreement signed on August 1, 1955, between the plaintiff and the late Henry C. Osborn, is valid and in full force and effect and that the plaintiff, as surviving spouse, is not entitled to an intestate share of the estate of Henry C. Osborn by reason thereof.

In the light of this conclusion as far as this plaintiff is concerned further discussion on the other issues raised herein is unnecessary. However, since the court earlier overruled the

motion of the defendants to separately state and number the causes of action and thereby required both sides to submit extensive testimony and voluminous briefs on these issues we feel constrained to state the conclusions reached on these points which otherwise might remain unresolved.

Moving forward from their argument that the antenuptial agreement was invalid, counsel for plaintiff next contended that she was entitled to her widow's statutory share in the probate estate and also in Trust No. 1, "because he kept substantially all of his property in his revocable inter vivos trust." Significantly the plaintiff raised no serious question about the No. 4 Trust, under which she was the only beneficiary with full testamentary power. The defense claimed that current Ohio law barred her from any share in the No. 1 Trust.

In *Smyth* v. *Cleveland Trust Co.*, 172 Ohio St. 489, the husband established an inter vivos trust, reserving the income therefrom to himself and retaining the power to amend or revoke the trust. At his death the widow attempted to include the corpus of the trust in the net estate of her husband. Relying on the rule stated in *Bolles* v. *Toledo Trust Co.*, 144 Ohio St. 195, and *Harris* v. *Harris*, 147 Ohio St. 437, she claimed that the inter vivos trust did not preclude the widow from claiming a statutory share of the trust corpus.

The Supreme Court, noting that Section 1335.01, Revised Code, expressly states that trusts of the type under discussion are valid and make no exception concerning a wife, overruled the *Bolles* and *Harris cases* and denied the widow the right to claim a statutory share in the corpus of the revocable inter vivos trust. The court wrote that "neither the statute nor the general rule recognized as existing in the majority of courts of last resort and stated in the Restatement of the Law justifies the continued recognition in this state of the rule enunciated in the *Bolles* and *Harris cases.*"

In the *Harris case*, Judge Zimmerman in his dissent had forecast the change in the law in Ohio in the following words:

"Within the provisions of present Section 8617, General Code [now Section 1335.01, Revised Code], it is plain that an individual during his lifetime may create a valid revocable trust, with the reservations stipulated, which will operate to exclude any claim of the surviving spouse to a 'distribution

share' of the property in the trust upon the settlor's death. If the existence of a situation of this kind is undesirable in Ohio, the General Assembly is the agency to adopt corrective legislation."

A suggestion appearing in a law review article (Vol. 16 University of Cincinnati Law Review 191) advances a practical approach in view of the explicit language of Section 1335.01, Revised Code:

"* * * the proper rule would be to hold valid any written trust agreement that clearly expressed the donor's intention and permitted the court to ascertain the objects of his bounty, if title to the trust property actually passed to and remained in the trustee, or the property was definitely segregated and held by the donor as trustee, even though the donor could later in any manner terminate the trust or re-acquire the trust property, provided he had not done so."

Of course, the trust would always be open to attack, in a proper case, for fraud, undue influence, or donor's incompetence. Where the gift in trust was made shortly before death with the obvious purpose of defeating the rights of a surviving spouse, undoubtedly the courts would go a long way to hold invalid a trust that otherwise might be valid. Equity looks with askance upon any action which indirectly seeks to accomplish what otherwise could not be done directly. We share the view expressed by many courts confronted with such a problem that it is high time that the Ohio General Assembly took another look at the inter vivos statute and the effect it has upon the rights of a surviving spouse.

As to the surviving spouse, the policy of the Ohio law is to give him or her a definite share in a decedent's estate, which cannot be taken away by testamentary disposition. However, there is nothing which prevents or forbids completed gifts in a man's lifetime. Clearly a husband may transfer his personal property to a trust during coverture, to the detriment of his wife. The real question arises not over whether the gifts were placed in trust or not, but whether a completed gift has been effected or not. If it is effectually completed there is simply no question of testamentary disposition in connection with the gift. On the other hand, if the gift has not been effectually completed because of restrictive terms used in making the gift, or the con-

tinued dominion and control over the gift, the mere designation of "trustee" does not elevate a custodian or an agent to that status. In that event, the death of the so-called settlor or donor revokes the agency and the property of the decedent passes either under a will or pursuant to the intestate laws. The question for determination then is whether you are dealing with a trust or merely an agency.

As was written once earlier in this memorandum, this case, here more particularly the No. 1 Trust, must be viewed in the light of the facts and surrounding circumstances. In the instant case, the mere retention of the income rights in the No. 1 Trust by Mr. Osborn together with the right to amend or revoke did not equal such control or dominion which would vitiate the trust. In serving its proper function an inter vivos trust provides management during the settlor's life, expeditiously disposes of the property at his death, limits costs of administration and widespread publicity on the probate of a will. During his lifetime he can observe how the trustee manages the trust, participate to some degree in the management, modify or even revoke the trust entirely. If the law is to recognize these rights of the settlor and sanction inter vivos trusts, the courts are charged with the responsibility of determining whether or not the trust is, in fact, a true trust.

After hearing all the testimony on this issue and reviewing the scores upon scores of exhibits received into the evidence, the court concludes that the Henry C. Osborn Trust fails to meet the requirements of a true trust, "both in the manner of administration by the bank and in the pervasive dominion and control which Mr. Osborn continually exercised, solely for his own personal advantage." Without attempting to list all the instances of domination and practically exclusive control of the bulk of the corpus of the trust, we will refer to some of the facts supporting this conclusion. As was suggested by counsel for plaintiff it served more as a combination bank account and safety deposit box for his benefit. Not only were all of his securities included, but an insurance policy issued by the Cleveland Automobile Club to its members and qualifying shares in various private clubs. His Cleveland home was carried as an asset of the trust, but he paid no rent and when it was of no more use to him as a home he took it back and used it to cut his income

tax by a charitable deduction. Trust assets were used as collateral on personal loans and to pay his personal expenses, although he dutifully completed the revocation forms from a supply he kept available. A loan arrangement worked out with the bank provided him with a device to raise cash without incurring substantial tax liability and to defer sales until after his death when no capital gains tax would be payable, with the interest in the interim used as a tax deduction.

Although the trust agreement called for nothing more than obtaining "whenever practicable" his approval of the trustee's investment determinations, he made the decisions and continually rejected the trustee's demands for trust diversification. According to a former vice-president who handled the matters for the trust and Mr. Osborn, he could not think of an instance in which the bank ever changed a decision or refused a request by Mr. Osborn, after discussing the matter with him. Further all the indicia of ownership of the stocks which were issued in his name were sent to him, not the trustee. With one exception, Mr. Osborn's income and personal property tax returns show this income as received directly by him rather than through the trust. His return to the Securities and Exchange Commission on November 30, 1959, listed shares of Addressograph-Multigraph stock as directly owned by him.

Several exhibits revealed: "While cash additions and withdrawals were often large in amount (in the years 1956 through 1960, the cash revocations alone total over $580,000), they include amounts as low as $12.19 (addition) and $10.94 (withdrawal). The number and scope of these 'additions' and 'revocations' transactions reveal a use of the account not unlike the use one would make of an ordinary commercial bank account or a custodianship."

The evidence clearly showed that Mr. Osborn retained power and control over the assets and held legal title to the bulk of the assets in the No. 1 Trust, originally established in 1920. In August 1960, around Mr. Osborn's eightieth birthday, he finally surrendered to the transfer agent for Addressograph-Multigraph Corporation various certificates representing a total of 92,100 shares of common stock of said corporation, all of which were in the name of Henry C. Osborn, with instructions to reissue the shares in the name of A. A. Welsh & Co., which

incidentally had served as the registered nominee of the Cleveland Trust Company since October 15, 1938. Defendants' claim that Mr. Osborn was the unregistered nominee until the transfer in 1960 was woefully feeble.

Without further enlarging this memorandum with additional details, we believe the evidence reflects that the arrangement between the bank and Mr. Osborn was so completely dominated by him that although it was referred to as a trust it remained an agency account. While conceding that an argument might be advanced that since in 1933 some 4900 shares of stock were transferred to the bank through a stock power signed by Henry C. Osborn naming the bank as transferree; that the bank as trustee paid realty taxes on the residence for a period of time; that some bonds were handled by the bank and stock powers signed in blank generally were delivered with the stock certificates turned over to the bank; and, that he finally consented to transfer the bulk of the Addressograph stock certificates shortly prior to his death, the court looking at the total picture believes that such a working arrangement was a custodial account and in the nature of a testamentary disposition and certainly did not meet the true concept of a trust.

With the increasing popularity of the revocable living or inter vivos trust in modern estate planning, it should be made clear that the phraseology used in the trust instrument is meaningless, if the so-called settlor or donor actually remains in virtual control and the so-called trustee for fear of losing the business acquiesces in his every act and wish. Where the trustee continually yields and makes adjustments in an attempt to keep a semblance of a true trust, a mere agency or custodianship is bound to result.

By way of summary, then, under the current law of Ohio, a person can observe the operation of one's estate plan and provide for the consolidation of the entire estate in a trust program, but the trust must meet the test of a true trust in order to maintain its non-testamentary character. The trust instrument executed by Henry C. Osborn in 1920 and modified over the years meets the test as to form. If there had been full compliance with the terms and spirit of the No. 1 Trust as executed, the surviving spouse could not successfully seek its invalidation. However, due to the complete dominance of Henry C. Osborn

188

and the meek acquiescence of the bank the trust in question was not a trust in fact. This conclusion of the court offers little solace to the plaintiff herein because of the validity of the antenuptial agreement wherein she waived all her rights in the property and estate of Henry C. Osborn.

Accordingly, the court finds that the antenuptial agreement was valid and binding upon the parties and that plaintiff's petition is hereby dismissed at her costs.

*Petition dismissed.*