**BARNES GROUP, INC., Appellee,**

v.

**C & C PRODUCTS, INC., Appellant,**

**and**

**Roy E. McGuire, Defendant.**

**No. 82–1636.**

United States Court of Appeals, Fourth Circuit.

Argued March 10, 1983.

Decided Aug. 31, 1983.

Rehearings and Rehearings En Banc Denied Dec. 21, 1983.

Leslie W. Jacobs, Cleveland, Ohio (Thompson, Hine & Flory, Cleveland, Ohio, on brief), and Harold W. Jacobs, Columbia, S.C. (Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C., on brief), for appellant.

Robert W. Dibble, Jr., Columbia, S.C. (McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, Columbia, S.C., Arthur J. Schwab, Craig W. Jones, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., John E. Besser, Gen. Counsel, Barnes Group, Inc., on brief), for appellee.

Before HALL, PHILLIPS and MURNAGHAN, Circuit Judges.

PER CURIAM:

The court's judgment is by split decision of the panel. The court's majority decisions respecting the several claims at issue are here summarized.

1. The district court's determination that C & C Products, Inc. (C & C) tortiously interfered with the contracts of George Maria (Maryland contract) and Roy McGuire (South Carolina contract) is affirmed. Judge Hall dissents.

2. The district court's determination that C & C tortiously interfered with the contracts of Craig Berry, James Floyd, Cy Flinchum (Alabama contracts) and S.D. Richardson (Louisiana contract) is reversed. Judge Murnaghan dissents.

3. The district court's award of compensatory and punitive damages is vacated and remanded for further proceedings limited to the fixing of damages on the claims affirmed as to liability.

4. The district court's injunctive decree is vacated and remanded for modification limiting its scope to the territorial bounds of Maryland and South Carolina. Judge Hall dissents to the extent the injunctive decree is not wholly reversed. Judge Murnaghan dissents to the extent the decree is not wholly affirmed, but concurs to the extent it is affirmed in its application to the Maryland and South Carolina territories.

The several views of the panel are set out in the opinions that follow.

Judge Phillips has written the lead opinion which states the decision of a majority

of the panel on each issue; Judge Hall and Judge Murnaghan have each written separate opinions concurring in part and dissenting in part from the lead opinion.

JAMES DICKSON PHILLIPS, Circuit Judge:

This diversity action was instituted against C & C Products, Inc. (C & C) by Barnes Group, Inc., Bowman Distribution division (Bowman), which alleged that C & C had tortiously interfered with the contracts of six Bowman sales agents. C & C appeals from a final judgment of the district court, entered after a bench trial, finding it liable in tort and awarding Bowman injunctive and compensatory and punitive damages. Because the district court erred in its analysis of dispositive choice-of-law issues we reverse the judgment in part and remand for further proceedings.

I

Bowman operates out of its headquarters in Ohio[1] a nationwide business in the selling of washers, nuts, bolts, and other fungible parts used in the production and repair of vehicles and machinery. Given the nature of the business, *see generally Barnes Group, Inc. v. Harper,* 653 F.2d 175, 176 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982), Bowman's sales force is central to its competitive success; Bowman apparently relies almost exclusively upon its salesmen for development and maintenance of its customer base. These salesmen, who the parties concede are independent contractors and not employees, are under contract, terminable at will by either party, to develop clients for Bowman in non-exclusive geographic areas. The standard contract includes a restrictive covenant, centrally in issue on this appeal, whereby the salesman agrees, for a two-year period after severing relations with Bowman, not to sell Bowman-like products to any customer with whom he had dealt over the final two years he was under contract with Bowman.[2] As well, the contract provides that it "shall be construed in ac-

---

1. C & C is incorporated in Ohio, with its principal place of business in Cleveland; there is diversity of citizenship because Bowman is a division of a Delaware corporation having its principal place of business in Connecticut.

2. The precise language reads:

    The Salesman agrees that upon termination of this agreement for any reason whatsoever he will not, for a period of two (2) years thereafter, sell or attempt to sell any products of the same or similar kind as those sold by [Bowman], to any of the customers to whom he made one or more sales for [Bowman] within the last two years prior to such termination. The Salesman agrees that his promise herein made so to refrain from selling or attempting to sell means that he will not, directly or indirectly, either as an individual on his own account or as a partner, employee, agent or salesman of or for any person, firm association or corporation, or as an officer, director or stockholder of any closely-held corporation as hereinafter defined, engage in selling or attempting to sell any of said products to any of the customers hereinabove designated. This covenant shall not be deemed violated by the Salesman's engaging in the business of a manufacturer or retailer of said products, but it shall be deemed violated by any sale of said products to any of said customers by the Salesman in or for a business combining retail and wholesale sales if the wholesaling is a substantial part of such combined business. For the purposes of this covenant automobile manufacturers and their franchised new-car dealers shall not be considered to be in the business of wholesaling.

    The term "closely-held corporation", as used herein, shall be any corporation in which the Salesman or his wife, child or parent owns, directly or indirectly, more than ten per cent (10%) in value of the outstanding stock, or a corporation in whose management the Salesman is an active participant.

    If it should become desirable or necessary for the Company to seek compliance with this covenant by judicial proceedings, the period during which the Salesman will not sell or attempt to sell any products of the same or similar kind as those sold by the Company to any of the customers to whom he made one or more sales for the Company, shall extend to the second anniversary of the date of the judicial order requiring such compliance.

    This covenant on the part of the Salesman is of the essence of this agreement; it shall be construed as independent of any other provision in this agreement, and the existence of any claim or cause of action of the Salesman against the Company, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant.

cordance with the laws of the State of Ohio."

It is undisputed that between 1977 and 1979 six Bowman salesmen signed contracts with C & C, a Bowman competitor, and commenced selling to former Bowman customers in violation of the contractual covenant not to compete. Three of these salesmen—Craig Berry, James Floyd, and Cy Flinchum—were Alabama residents who had sold for Bowman exclusively in Alabama; all three were assigned by C & C to new territories in Alabama. Another salesman, George Maria, haled from Maryland, and had serviced Bowman clients in Maryland and the District of Columbia; C & C reassigned him to cover portions of Maryland, Virginia, and the District of Columbia. S.D. Richardson, a Louisiana resident, was assigned by C & C a territory in Louisiana overlapping much of the area he had previously covered for Bowman. Finally, Roy McGuire, a resident of South Carolina who had previously sold for Bowman there, was hired by C & C to manage salesmen throughout South Carolina and to make customer calls as well.

Bowman filed suit in October 1979 against C & C[3] in the United States District Court for the Northern District of Ohio, alleging that C & C's dealings with these six salesmen constituted tortious interference with the restrictive covenant contained in the standard Bowman contract.[4] Pursuant to 28 U.S.C. § 1404(a), the case was transferred in December 1979 to the District Court for the District of South Carolina, where it proceeded to a bench trial on the merits. Applying Ohio law, as stipulated in the choice-of-law provision of the Bowman contract, the district court determined that the restrictive covenants were a reasonable means for protecting Bowman's legitimate business interests. Accordingly, it adjudged C & C liable for tortious interference with those covenants, awarded Bowman $243,000 in compensatory and $250,000 in punitive damages, and entered a decree enjoining C & C from further interference with Bowman contracts.

## II

This case presents two difficult and interrelated choice-of-law questions that we find were resolved erroneously, at least in part, by the district court. We address first the question of the law that properly should govern a threshold determination of whether the restrictive covenants at issue are enforceable between the parties, and then turn to consider the law that should govern questions of tort liability for interference with the contracts found enforceable.

## A

As the parties concede, a necessary element of the tort of intentional interference with contract is that the contract at issue be valid and enforceable as between the parties to it. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 837 (2d Cir.1980); *Advance Industrial Security, Inc. v. William J. Burns International Detective Agency, Inc.,* 377 F.2d 236, 238 (5th Cir.1967). In this case particularly, C & C's liability for tortious interference hinges almost entirely upon whether the Bowman restrictive covenants are enforceable, because the facts clearly establish all other elements of the tort.[5]

---

**3.** Bowman also sued Roy McGuire individually for breach of his salesman's agreement. McGuire has not appealed from the district court order finding him liable for unlawful business interference.

**4.** Bowman's complaint included allegations—additional to those concerning breach of covenants not to compete—that C & C had induced breach by the salesmen of their contractual duty not to disclose trade secrets or confidential information. The course of proceedings to date, however, and the parties' arguments on appeal have focused solely on whether there

was a breach of the salesmen's restrictive covenant. For instance, the monetary damages awarded to Bowman by the district court were measured solely on the basis of lost sales, without mention of disclosed confidential information. We presume the trade-secrets allegations have been abandoned or otherwise disposed of by consent of the parties.

**5.** The district court found that C & C interfered with the contractual relationship between Bowman and its salesmen:

by soliciting and enticing Bowman salesmen to leave Bowman by stating that the

On appeal, C & C's principal assignment of error is that the trial court erred, as a matter of law, in applying Ohio law to determine the enforceability of the restrictive covenants with which C & C allegedly interfered.[6] The district court's application of Ohio law was based entirely upon the stipulation in the standard Bowman contract that it "shall be construed in accordance with" Ohio law. The first potentially dispositive question on appeal therefore is whether, as a matter of law, the contractual choice-of-law provision is controlling.

As dictated by *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the district court was bound, as are we, to apply here the prevailing law of the transferor forum, the District Court for the Northern District of Ohio, which in turn would apply Ohio choice-of-law principles in this diversity action, *Klaxon Co. v. Stentor*

*Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Seeking the applicable Ohio choice-of-law rule, we have looked first to the possibility that there might be directly controlling Ohio precedent for the specific rule of decision. Finding none, we have turned, therefore, to general choice-of-law doctrine and principles, as currently applied by the Ohio courts, for guidance to the applicable rule. That inquiry has persuaded us that the Ohio courts currently apply contemporary choice-of-law doctrine based upon interest analysis, the most significant relationship, and the *Restatement (Second) of Conflicts. See Bonkowsky v. Bonkowsky,* 19 Ohio Op.3d 113, 114 (Ct.App.1980) (torts), *aff'd,* 69 Ohio St.2d 152, 431 N.E.2d 998, *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352 (1982); *S & S Chopper Service v. Scripter,* 59 Ohio App.2d 311, 312–13, 394 N.E.2d 1011, 1012–13 (1977) (contracts).[7] We

---

Bowman restrictive covenant was not enforceable and by promising that C & C would pay any legal expenses if Bowman sued them, and by making other unfair statements intended to cause them to break their contract with Bowman;

by encouraging the Bowman salesmen hired by C & C to breach their restrictive covenant—and to use the confidential information received from Bowman to divert their Bowman accounts to C & C;

by encouraging at least two of Bowman's salesmen to work for and transfer their former Bowman accounts to C & C before resigning from Bowman; and

by encouraging them to bring other Bowman salesmen with them to C & C.

Notwithstanding C & C's argument to the contrary, these factual findings are not clearly erroneous, and provide ample support for the district court's ultimate finding of liability on the tortious interference claim to the extent the covenants are enforceable ones under governing law, and, of course, to the extent the tort of tortious interference is itself recognized under applicable state laws. As to the last point, see *infra* Part II B.

**6.** C & C does not dispute that the restrictive covenants are reasonable and enforceable under Ohio law.

**7.** *See also Jones v. Wittenburg Univ.,* 534 F.2d 1203, 1213 (6th Cir.1976); *Saalfrank v. O'Daniel,* 390 F.Supp. 45, 57 (N.D.Ohio 1974), *rev'd on other grounds,* 533 F.2d 325 (6th Cir.), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *Moats v. Metropolitan Bank,* 40

Ohio St.2d 47, 49, 319 N.E.2d 603, 604 (1974); *Fox v. Morrison Motor Freight,* 25 Ohio St. 193, 195–99, 267 N.E.2d 405, 407–08, *cert. denied,* 403 U.S. 931, 91 S.Ct. 2254, 29 L.Ed.2d 710 (1971); *Osborn v. Osborn,* 10 Ohio Misc. 171, 176–77, 226 N.E.2d 814, 818 (Cuyahoga Cty. C.P. 1966), *aff'd,* 18 Ohio St.2d 144, 248 N.E.2d 191 (1969).

Ohio choice-of-law doctrine is far from settled or clearly defined. *See generally* Note, *Ohio Choice-of-Law Rules: A Guide to the Labyrinth,* 44 Ohio St. L.J. 239 (1983). But we think the cited cases most accurately reflect the present state of Ohio law, particularly with regard to questions arising from contractual choice-of-law provisions, for which the rule-oriented approach of the first *Restatement of Conflicts* provides no ready analytical framework. *See* Note, *supra,* at 253 ("When [Ohio] courts find that traditional rules do not resolve the case at hand adequately, they may turn to the newer type of analysis.").

In ascertaining prevailing Ohio choice-of-law precepts, we specifically decline to rely upon a series of diversity cases, decided under Ohio law, that have applied the territorial principles of the first *Restatement. See, e.g., Arsham v. Banci,* 511 F.2d 1108, 1114 (6th Cir.1975); *American Druggists' Ins. Co. v. Equifax, Inc.,* 505 F.Supp. 66, 68 (S.D.Ohio 1980); *McCluskey v. Rob San Servs., Inc.,* 443 F.Supp. 65, 68 (N.D.Ohio 1977); *Perlmuter Printing Co. v. Strome, Inc.,* 436 F.Supp. 409, 413 (N.D.Ohio 1976). These decisions did not address the most recent choice-of-law developments in Ohio, but drew instead upon earlier precedent that no longer can be considered controlling.

therefore look to that general body of doctrine as a guide to the specific rule of decision that Ohio would presumably apply to the choice-of-law issues before us here.

A basic principle under contemporary choice-of-law doctrine is that parties cannot by contract override public policy limitations on contractual power applicable in a state with materially greater interests in the transaction than the state whose law is contractually chosen. *See Restatement (Second) of Conflicts* § 187(2)(b) (1971). While contemporary doctrine recognizes a sphere of party autonomy within which contractual choice-of-law provisions will be given effect,[8] it also limits the extent to which deft draftsmanship will be allowed to bypass legislative judgments as to basic enforceability or validity.[9] This is implicit in the *Restatement (Second) of Conflicts* § 187(2)(b), which provides that a contractual choice-of-law clause will not be given effect on matters such as "capacity, formalities and substantial validity," [10] *id.* comment *d,* when "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties." [11] We believe Ohio would apply this choice-of-law rule here as part of its contemporary choice-of-law doctrine. *Cf. Woelfling v. Great-West Life Assurance Co.,* 30 Ohio App.2d 211, 216, 285 N.E.2d 61, 66 (1972) (citing *Restatement (Second)* § 192 in construing choice-of-law in insurance policy).

Applying the *Restatement (Second)* § 187 formulation,[12] we think it clear that, absent

---

See generally West v. American Tel. & Tel., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

Another line of cases decided under Ohio law has formulated what at first blush appears to be a hybrid approach to interest analysis, combining elements from both the first and second *Restatements.* For instance, in *Lake v. Richardson-Merrell, Inc.,* 538 F.Supp. 262, 272 (N.D. Ohio 1982), it was observed that "Ohio courts apply the rule of *lex loci delicti,* tempered with considerations of public policy and governmental interests." *See also Loughan v. Firestone Tire & Rubber Co.,* 624 F.2d 726, 729 (5th Cir.1980); *Michell v. General Motors Corp.,* 439 F.Supp. 24, 27 (N.D.Ohio 1977). Upon closer observation, however, these references in Ohio law to *lex loci delicti* appear to reflect simply a residual choice-of-law rule in situations of false conflict where *neither* Ohio nor other concerned jurisdictions have a true interest in applying their own law. *See Lake v. Richardson-Merrell,* 538 F.Supp. at 272–76 (choice of law based upon a weighing of government interests, without reference to *lex loci delicti*). They do not shake our conviction that Ohio would apply interest analysis, rather than the principles of the first *Restatement,* when faced with a true conflict such as that presented here.

8. Parties are not "legislating" when they choose governing law, "because the forum has adopted a choice of law rule which provides that the law chosen by the parties shall be applied." Reese, *Contracts and the Restatement of Conflict of Laws, Second,* 9 Int'l & Comp.L.Q. 531, 534 (1960).

9. *See Lauritzen v. Larsen,* 345 U.S. 571, 588–89, 73 S.Ct. 921, 931–32, 97 L.Ed. 1254 (1953);

*Dothan Aviation Corp. v. Miller,* 620 F.2d 504, 506–07 (5th Cir.1980); *Foreman v. George Foreman Assocs.,* 517 F.2d 354, 357 (9th Cir. 1975); *Warren Bros. Co. v. Cardi Corp.,* 471 F.2d 1304, 1307 n. 3 (1st Cir.1973); *Southern Int'l Sales Co. v. Potter & Brumfield Div. of AMF, Inc.,* 410 F.Supp. 1339, 1342 & n. 8 (S.D. N.Y.1976); *Kronovet v. Lipchin,* 288 Md. 30, 43–46 & n. 16, 415 A.2d 1096, 1104–1106 & n. 16 (Ct.App.1980). *See generally* Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?,* 82 Colum.L.Rev. 1659, 1666–67, 1672–77 (1982).

10. In contrast, parties enjoy full autonomy to choose controlling law with regard to matters within their contractual capacity. *See Restatement (Second) of Conflicts* § 187(1) (1971). *See generally* Sedler, *The Contracts Provisions of the Restatement (Second): An Analysis and a Critique,* 72 Colum.L.Rev. 279, 286–90 (1972).

11. The *Restatement* also specifies two other circumstances, not apposite here, in which a contractual choice of law will not be given effect in matters concerning capacity and substantive validity: where the state whose law is chosen has no substantial relationship to the contract; and where the choice-of-law clause is the result of misrepresentation, duress, undue influence, or mistake. *See Restatement (Second) of Conflicts* § 187(2)(a) & comment *b.*

12. This analysis is not affected by whether the choice-of-law provision stipulates forum or non-forum law. While many cases where § 187(2) has been applied to override a stipula-

the contractual choice-of-law provision, Ohio conflicts principles [13] would mandate application here of the substantive laws of Alabama, Louisiana, Maryland,[14] and South Carolina—where the six salesmen whose contracts are at issue work and reside—to determine the basic enforceability of these restrictive covenants between the contracting parties. The local jurisdictions involved here have interests at two levels in applying their own law on the enforceability of restrictive covenants: to protect employee-residents from contractually abrogating their ability to earn a livelihood, and to control the degree of free competition in the local economy.[15] These interests in regulating business relationships within the states outweigh any generalized interest Ohio might have in applying its own law to protect the interstate contracts of its domiciliary, *see Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123, 126–27 (S.D.Ala.1978), *aff'd,* 599 F.2d 743 (5th Cir.1979), *cert. denied sub nom. Seibert v. Baptist,* 446 U.S. 918, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980), and compel the conclusion that, under Ohio choice-of-law rules, the laws of these other jurisdictions would control if there were no contractual stipulation of Ohio law.[16] *See S & S Chopper Service v. Scripter,* 59 Ohio App.2d 311, 312–13, 394 N.E.2d 1011, 1012–13 (1977); *see also supra* note 7 and accompanying text.

■ The remaining and most vexing element of the *Restatement (Second)* formulation, in determining whether to adhere to the contractual choice-of-law provision, concerns whether application of Ohio law would be "contrary to a fundamental policy" of any or all of the jurisdictions involved,[17] all of which undoubtedly have a

tion of applicable law involve a factual pattern slightly different from the one presented here in that the law of the forum would apply absent the parties' contractual choice of non-forum law, *see, e.g., Pan American Computer Corp. v. Data General Corp.,* 467 F.Supp. 969, 970 (D.P. R.1979); *Boyer v. Piper, Jaffray & Hopwood, Inc.,* 391 F.Supp. 471, 472–73 (D.S.D.1975); *Nasco, Inc. v. Gimbert,* 239 Ga. 675, 676–77, 238 S.E.2d 368, 369 (1977), § 187(2) has been applied as well to bypass the contractual choice of forum law, *see, e.g., Keystone Leasing Corp. v. Peoples Protective Life Ins. Co.,* 514 F.Supp. 841, 847–48 (E.D.N.Y.1981); *Business Incentives Co. v. Sony Corp.,* 397 F.Supp. 63, 67 (S.D.N.Y.1975). The forum of the litigation should have no analytical relevance—save in determining the applicable choice-of-law rules—to evaluating whether a contractual choice-of-law provision is controlling. In practical application, however, the choice of forum may have sizeable import. *See* Sedler, *supra* note 10, at 294–95, 297.

**13.** There would be no constitutional obstacle to Ohio's applying its own substantive law. *See Allstate Ins. Co. v. Hague,* 449 U.S. 302, 313–20, 101 S.Ct. 633 (1981) (plurality opinion); *Watson v. Employers Liability Assurance Corp.,* 348 U.S. 66, 73, 75 S.Ct. 166, 170, 99 L.Ed. 74 (1954).

**14.** George Maria, one of the six former Bowman salesmen hired by C & C, is a Maryland resident whose territory now covers Maryland as well as parts of Virginia and the District of Columbia. Our choice-of-law analysis does not address the prevailing substantive law in these latter two jurisdictions because—from among the three jurisdictions whose interests are im-

plicated by enforcing the restrictive covenant contained in Maria's Bowman contract—Maryland has the greatest interest in applying its law.

**15.** *See* Blake, *Employee Agreements Not To Compete,* 73 Harv.L.Rev. 625, 627 (1960).

**16.** Professor Brainerd Currie's original formulation of interest analysis rejected the proposition that a court could or should weigh the competing interests of two jurisdictions in resolving a true conflict of law such as that presented here. *See* Currie, *Notes on Methods and Objectives in the Conflict of Laws,* 1959 Duke L.J. 171, 176–78; *see also* Sedler, *The Governmental Interest Approach to Choice of Law: An Analysis and a Reformulation,* 25 U.C.L.A.L.Rev. 181, 227 (1977) (arguing that the forum should apply its own law when faced with a true conflict of law in which it has a real interest). But the commentators and courts—including Ohio, which we follow here, *see supra* note 7 and accompanying text—have almost uniformly embraced a weighing of conflicting government interests. *See* J. Martin, *Conflict of Laws: Cases and Materials* 234–36 (1978); Note, *Comparative Impairment Reformed: Rethinking State Interests in the Conflict of Laws,* 95 Harv.L.Rev. 1079, 1083 n. 19 (1982). This process of weighing government interests might more appropriately be considered under a theory of "comparative impairment." *See id.* at 1087–99.

**17.** Whether a policy is sufficiently weighty to be considered "fundamental" must be determined according to the choice-of-law principles

"materially greater interest" than does Ohio in whether these covenants are enforceable, *cf. Nordson Corp. v. Plasschaert,* 674 F.2d 1371, 1375–76 (11th Cir.1982) (parties' choice of Ohio law would be honored, despite Georgia's fundamental policy against covenants not to compete, because Georgia did not have materially greater interest in applying its law than did several other jurisdictions in applying theirs to the same covenants). It is apparent that there can be no clear-cut delineation of those policies that are sufficiently "fundamental," within the meaning of § 187(2)(b), to warrant overriding a contractual stipulation of controlling law. *See Restatement (Second) of Conflicts* § 187 comment *g.* Nonetheless, a few general landmarks offer some structure for this inquiry. First, not every situation where contractually chosen law diverges merely in degree[18] from that of the state whose law would otherwise apply impinges upon the fundamental policy of that state.[19] *See Warren Brothers Co. v. Cardi Corp.,* 471 F.2d 1304, 1307 n. 3 (1st Cir.1973) (a contractual choice of law will not be respected "if a *serious* conflict with state policy were to result") (emphasis added). This is seen most clearly in regard to usury statutes, where the parties' choice of law has been held to validate interest rates that would be usurious and unenforceable in the jurisdiction whose law would prevail absent the contractual stipulation of controlling law. *See Sarlot-Kantarjian v. First Pennsylvania Mortgage Trust,* 599 F.2d 915, 917–18 (9th Cir.1979); *National Surety Corp. v. Inland Properties, Inc.,* 286 F.Supp. 173, 188–89 (E.D.Ark.1968), *aff'd,* 416 F.2d 457 (8th Cir.1969).[20] *See generally Miller v. Premier Corp.,* 608 F.2d 973, 986 & n. 19 (4th Cir.1979). At the other extreme, it seems apparent that where the law chosen by the parties would make enforceable a contract flatly unenforceable[21] in the state whose law would otherwise apply, to honor the choice-of-law provision would trench upon that state's "fundamental policy." *See, e.g., Fine v. Property Damage Appraisers, Inc.,* 393 F.Supp. 1304, 1308 (E.D.La. 1975); *Boyer v. Piper, Jaffray & Hopwood, Inc.,* 391 F.Supp. 471, 474–75 (D.S.D.1975).[22]

■ The district court's application of Ohio law to determine the enforceability of

---

of Ohio, the forum state. *See Restatement (Second) of Conflicts* § 187 comment *g* (1971). Our research has disclosed no Ohio cases on this point, however, and therefore we essay to determine the approach that would be followed by the Ohio courts.

18. As one commentator has put it, laws differing only in degree would "provide similar but not identical protection." Note, *supra* note 9, at 1685.

19. Moreover, merely because a state labels its policy as "fundamental"—or does not—cannot be dispositive.

In contrast to the view of Judge Hall in dissent, the "fundamental policy" exception of § 187(2)(b) does not come into play merely because the contractually chosen law touches on a matter of fundamental state concern. Rather, fundamental policy is impinged upon only when there are significant differences between the chosen law and that of the jurisdiction whose law otherwise would apply.

20. The *Restatement (Second) of Conflicts* § 203 makes special provision for choice-of-law clauses in the context of usury laws. However, both the cited decisions were applying the general approach of § 187. *See also* Note, *supra* note 9, at 1684–85.

21. We distinguish here between contracts void and unenforceable within a state, as a matter of public policy, and those that are voidable by the parties on questions related to matters of validity. *Cf.* Sedler, *supra* note 10, at 296 ("questions analytically going to validity, such as the existence of consideration, do not involve a strong public policy").

22. Between these extremes fall situations where the law of the jurisdiction stipulated by the parties and that of the state whose law would control absent the choice-of-law provision differ significantly—not merely in degree but in approach—as to the enforceability of the contract. A likely example is presented by a comparison of Louisiana and Ohio law on restrictive covenants between employers and employees. While Ohio would enforce such covenants if "reasonable," Louisiana limits their enforceability to narrowly defined circumstances far more precise than a general concept of "reasonableness," *see National Oil Service v. Brown,* 381 So.2d 1269, 1272–73 & n. 2 (La.Ct. App.1980). Applying a mere "reasonableness" standard to such covenants—as opposed to those at issue here, involving independent contractors—could well abridge a "fundamental policy" of Louisiana. *See ADR v. Graves,* 374 So.2d 699, 700–01 (La.Ct.App.1979).

the restrictive covenants at issue presents both ends of this spectrum. Under Ohio law, covenants not to compete are enforceable if reasonable, *see Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 25, 325 N.E.2d 544, 547 (1975), a test similar to that applied under the laws of South Carolina, *see Almers v. South Carolina National Bank,* 265 S.C. 48, 51–52, 217 S.E.2d 135, 137 (1975), Maryland, *see Gill v. Computer Equipment Corp.,* 266 Md. 170, 181, 292 A.2d 54, 59 (1972), and Louisiana,[23] *see Simpson v. Kelly Services, Inc.,* 339 So.2d 490, 493 (La.Ct. App.1976). These latter jurisdictions differ from Ohio, if at all,[24] only in degree concerning the enforceability of covenants not to compete; hence the district court properly applied Ohio law to the covenants of the Maryland, South Carolina, and Louisiana salesmen, as stipulated by the parties, because it is not "contrary to a fundamental policy" of those states.

Under Alabama law, however, covenants not to compete, whether or not reasonable, are void as against public policy and cannot be enforced. *See Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123, 126–27 (S.D. Ala.1978), *aff'd,* 599 F.2d 743 (5th Cir.1979), *cert. denied sub nom. Seibert v. Baptist,* 446 U.S. 918, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980). To honor the contractual choice of law would make enforceable a contract flatly unenforceable in Alabama, surely impinging upon "fundamental policy" of Alabama. It was error, therefore, for the district court to apply Ohio law to determine the enforceability of the Alabama salesmen's covenants not to compete.

**B**

■ After determining the enforceability of the covenants not to compete, the district court applied Ohio law[25] to determine the contours of the cause of action for tortious interference with contract, because in its view Ohio was the *lex loci delicti.*[26] Without addressing whether the court's conclusion concerning the place of injury was correct, we think it plain that Ohio has abandoned *lex loci delicti* as the choice-of-

**23.** Under Louisiana law, non-competition agreements between employers and *employees* "are disfavored and are deemed contrary to public policy" except in narrowly defined circumstances. *See National Oil Service v. Brown,* 381 So.2d 1269, 1272–73 & n. 2 (La.Ct. App.1980); *see also ADR v. Graves,* 374 So.2d 699, 701–02 (La.Ct.App.1979). But this limited acceptance of restrictive covenants does not apply to contracts involving independent contractors, which Louisiana assesses under a general "reasonableness" standard. *See Simpson v. Kelly Services, Inc.,* 339 So.2d 490, 495 (La. Ct.App.1976).

**24.** Arguably, the "reasonableness" test under the laws of the various jurisdictions involved is identical. *Cf. Associated Spring Corp. v. Wilson,* 410 F.Supp. 967, 975 (D.S.C.1975) (finding a restrictive covenant reasonable and enforceable under the laws of both South Carolina and Ohio). The language of the relevant cases does not make this clear. *Compare, e.g., Almers v. South Carolina National Bank,* 265 S.C. 48, 52, 217 S.E.2d 135, 137 (1975) ("some time and geographic limitation must be incorporated into the covenant" for it to be reasonable), *with Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 25, 325 N.E.2d 544, 547 (1975) (among the factors to be considered in assessing reasonableness is the "absence or presence of limitations as to time and space"). More importantly, however, the tests need not be identical—so long as they

follow the same basic approach and differ only in particulars—to honor the parties' choice of law pursuant to the *Restatement (Second)* approach.

Ohio law on the enforceability of restrictive covenants does differ in one critical respect, not at issue here, from the laws of Maryland, South Carolina, and Louisiana: it will apply a variant of the "blue-pencil" rule to enforce an unreasonable covenant to the extent reasonable, *see Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 25–26, 325 N.E.2d 544, 546–47 (1975). We need not address whether application of such a rule is a difference in degree or in approach, *see supra* note 22. At least one court has held that application of a "blue-pencil" rule pursuant to a contractual choice-of-law provision would impinge upon fundamental policy of the state whose law would otherwise apply. *See Dothan Aviation Corp. v. Miller,* 620 F.2d 504, 506–07 (5th Cir.1980).

**25.** The contractual choice-of-law provision, of course, can have no bearing on the law controlling a tort action brought against a third person not a party to the contract.

**26.** The court held: "Ohio is the place where the tort of 'business interference' was committed— it was placed, directed and consummated by C & C officials, headquartered in Brook Park, Ohio."

law rule in torts cases in favor of the contemporary approach based upon interest analysis, see supra note 7 and accompanying text. And it is equally plain, applying this approach, that the local jurisdictions involved here—Alabama, Louisiana, South Carolina, and Maryland—have far greater interests than does Ohio in applying their law on tortious interference with contracts involving their residents that were to be performed solely within their boundaries. See Brinkley & West, Inc. v. Foremost Insurance Co., 499 F.2d 928, 932–35 (5th Cir. 1974).

Although the district court thus erred in applying Ohio law, for the most part this error was harmless because both South Carolina, see Chitwood v. McMillan, 189 S.C. 262, 265–66, 1 S.E.2d 162, 163 (1939), and Maryland, see Wilmington Trust Co. v. Clark, 289 Md. 313, 329, 424 A.2d 744, 754 (1981), as does Ohio, see Juhasz v. Quik Shops, Inc., 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977), recognize a classic common law cause of action for tortious interference with contract.[27]

In contrast, however, no cause of action for tortious interference with contract exists under Louisiana law, see Brinkley & West, 499 F.2d at 933–34. Accordingly, the court's error in applying Ohio law to the alleged interference with the personal service contracts being performed in Louisiana was prejudicial and requires correction.

### C

■ Our conclusions on the choice-of-law issues presented by this appeal can be summarized briefly. The district court properly honored the contractual choice-of-law provision in applying Ohio law to assess the enforceability of the restrictive covenants involving the Maryland, South Carolina, and Louisiana salesmen. But Alabama law, which holds such covenants unenforceable, should have been applied to the contracts of the three Alabama salesmen, and the court committed reversible error in not doing so. The district court committed reversible error as well in applying Ohio law to the claim for tortious interference with respect to the contract of the Louisiana salesman. We therefore affirm the district court's determinations that C & C tortiously interfered with the contracts of the Maryland and South Carolina[28] salesmen, but reverse its determinations that C & C tortiously interfered with the contracts of the Alabama and Louisiana salesmen.

### III

### A

The district court awarded Bowman compensatory damages of $243,544, computed on the basis of lost profits on sales made by the six salesmen with whose contracts C & C was found to have interfered.[29] On appeal, C & C assigns as error the method by which these damages were computed, and contends as well that the court improperly

---

**27.** Alabama also recognizes the tort of interference with contract in limited circumstances. See Homa-Goff Interiors, Inc. v. Cowden, 350 So.2d 1035, 1038 (Ala.1977). We need not address, however, the similarities of Alabama and Ohio law with respect to tortious interference with contract, because the covenants not to compete with which C & C purportedly interfered are unenforceable in Alabama. See supra part II A.

**28.** We reject the contentions advanced by C & C on appeal that the restrictive covenant entered into by McGuire, the South Carolina salesman, is unenforceable because not supported by consideration and because of prior breaches by Bowman of its contract with McGuire. The district court's factual findings, which we find not clearly erroneous, render

both these arguments untenable. We also find no support in the laws of the jurisdictions at issue here for C & C's theory that a covenant not to compete contained in a contract terminable at will by either party is unenforceable.

Similarly, we find no support in the record for C & C's attempt to assert laches or equitable estoppel as a defense to this suit.

**29.** Specifically, over the two-year period from the date each of the former Bowman salesmen was found to have been induced to leave by C & C, Bowman claimed—and the court accepted as fact—that it had lost $401,678 in gross sales made by these salesmen to former Bowman customers. The compensatory damage figure was then calculated by the court based upon its finding that Bowman's profit margin was 53.4%.

shifted the burden to C & C to file a response to Bowman's itemized claims, that the court erred in admitting into evidence summaries of the documents on damages, and that Bowman failed to mitigate damages.

■ In light of our disposition of the liability issue, we need not address specifically these contentions of error going only to the damages issues.[30] The damage award was computed as a lump sum, with no separate accounting made for lost profits arising from the six separate contractual breaches C & C was found to have induced. Because, with respect to four of the six contracts at issue, we reverse the findings of tortious interference, the entire issue of compensatory damages must be retried, on a reopened record, to determine damages properly recoverable for tortious interference with the Maryland and South Carolina salesmen's contracts.

B

C & C also contends that the district court erred in awarding Bowman $250,000 in punitive damages. Its argument runs that there was no showing of malice requisite to the imposition of punitive damages and that, in any event, the amount was unreasonable because greatly in excess of C & C's net worth. Again, because the punitive damage award hinges on the liability findings that we reverse in part, we must vacate and remand on the issue of punitive damages. In doing so, we also note an error in the application of state law on this issue that must be corrected on remand.

■ The district court awarded Bowman punitive damages based upon its finding that C & C had acted in "willful, wanton and reckless disregard" of Bowman's contractual rights. The factual underpinnings for this general conclusion, however, seem to be nothing more than the elements necessary to establishing the cause of action for tortious interference with contract.[31] We find this insufficient, under the law of Maryland and South Carolina,[32] to support an award of punitive damages.[33]

■ Maryland law makes clear that punitive damages will lie in tort actions arising out of contractual relations only where there is "actual or express malice," *H & R Block, Inc. v. Testerman*, 275 Md. 36, 43–47, 338 A.2d 48, 52–53 (1975), defined as "an evil or rancorous motive influenced by hate; the purpose being to deliberately and willfully injure the plaintiff," *Food Fair Stores, Inc. v. Hevey*, 275 Md. 50, 55, 338 A.2d 43, 46 (1975) (quoting *Siegman v. Equitable Trust Co.*, 267 Md. 309, 314, 297 A.2d 758, 760 (1972)). Under Maryland law, a mere desire to realize commercial gain—which appears on the present record fairly to characterize C & C's motivation—will not constitute actual malice requisite to an award of punitive damages. *See H & R Block*, 275 Md. at 47, 338 A.2d at 54.

■ We find South Carolina law, though not so explicit, to be in the same vein. *See Todd v. South Carolina Farm Bureau Mutual Insurance Co.*, 276 S.C. 284, 294, 278 S.E.2d 607, 612 (1981) ("punitive

---

30. We note in passing, however, that the district court's computation of damages was an outside estimate because based on the presumption that all sales made by the former Bowman salesmen would have been reaped by Bowman but for C & C's tortious interference with contract.

We reject C & C's argument that the district court abused its discretion in admitting damage summaries into evidence. *See* Fed.R.Evid. 1006.

31. The court found that "C & C, with full knowledge of Bowman's business relations with its salesmen, maliciously solicited 24 of Bowman's contract salesmen to leave Bowman

and join C & C's sales force and hired six of them to make sales to their Bowman customers in violation of their restrictive covenant."

32. Because South Carolina and Maryland law governs the bounds of the cause of action for tortious interference with contract, it controls as well on the question of damages. *See Restatement (Second) of Conflicts* § 171 (1971). Of course, we need not address Louisiana and Alabama law on the question of damages.

33. On the remand we order, it will be open to Bowman to establish those additional facts necessary to support an award of punitive damages under controlling principles.

damages may be justified for *aggravated, unjustified* interference with the contractual rights of a party") (emphasis added).[34]

On remand, the issue of punitive damages in respect of interference with the contracts of the Maryland and South Carolina salesmen must be addressed in light of the applicable state law.

### IV

The district court enjoined C & C from "soliciting, hiring, encouraging or inducing Bowman's contract salesmen from violating the terms of their sales agreements with Bowman while they are under contract with Bowman, and from inducing or encouraging them, for a period of two (2) years from the date of their leaving Bowman, to sell or attempt to sell similar C & C products to those former Bowman accounts to whom they have made one or more sales on behalf of Bowman during their last two years with Bowman." We vacate as well this injunctive decree; it clearly sweeps too broadly by including within its obviously intended reach jurisdictions, such as Alabama, where the Bowman restrictive covenants are unenforceable, and others, such as Louisiana, where Bowman has no cause of action against C & C. On remand, injunctive relief may appropriately issue to enforce Bowman's contractual rights within the territorial bounds of Maryland and South Carolina. But, as this litigation makes clear, given the uncertainty of Bowman's contractual and tort rights with respect to these restrictive covenants from state to state, injunctive relief should not be ordered with respect to contracts being performed in jurisdictions whose law has not been drawn in issue and properly applied in this action.

### V

The district court's finding that C & C tortiously interfered with the contracts of the former Bowman salesmen who lived in Alabama and Louisiana is reversed. Its finding of tortious interference with respect to the contracts of the Maryland and South Carolina salesmen is affirmed. The court's award of compensatory and punitive damages to Bowman is vacated and remanded for further proceedings consistent with this opinion.[35]

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED IN PART.

K.K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion insofar as it concludes that the district court erred in applying Ohio law to determine the enforceability of the Alabama salesmen's cov-

---

**34.** Our disposition of the punitive damages issue makes it unnecessary for us to consider directly whether the award was unreasonable in comparison to C & C's net worth. We note only that a defendant's financial circumstances properly should be considered in awarding punitive damages under the law of South Carolina, *see Patterson v. Bogan,* 261 S.C. 87, 95, 198 S.E.2d 586, 590 (1973), and Maryland, *see Carl M. Freeman Assocs. v. Murray,* 18 Md.App. 419, 428, 306 A.2d 548, 554 (1973), and that C & C's financial status remains an open question on remand.

**35.** C & C also assigned as error the district court's denial of its motion for leave to file a counterclaim, *see* Fed.R.Civ.P. 13(f), alleging that Bowman's restrictive covenants violated state and federal antitrust laws. It is apparent that leave to amend to include compulsory counterclaims, such as the one at issue, should be granted freely lest parties later be met with a plea of res judicata. *See* 3 J. Moore, *Moore's Federal Practice* ¶ 13.33, at 13–196 (2d ed. 1983). Mere delay in seeking leave to amend is not a sufficient basis upon which a district court may rest its denial of the motion, *Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods. Corp.,* 542 F.2d 1010, 1012 (8th Cir. 1976); *Spartan Grain & Mill Co. v. Ayers,* 517 F.2d 214, 220 (5th Cir.1975), but the district court has discretion, pursuant to Fed.R.Civ.P. 13(f), to deny leave to amend based upon a balancing of the equities, including whether the non-moving party will be prejudiced, whether additional discovery will be required, and whether the court's docket will be strained, *see Rohner, Gehrig & Co. v. Capital City Bank,* 655 F.2d 571, 576 (5th Cir.1981); *T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 370–71 (5th Cir.1980); *Mercantile Trust Co.,* 542 F.2d at 1012–13. Though in terms not wholly clear, the district court denied C & C's motion for leave to amend based upon a consideration of these factors, and we find no abuse of discretion.

enant not to compete and the claim of tortious interference with respect to the Alabama and Louisiana salesmen and that, with respect to those salesmen, the judgment below must be reversed. However, I cannot agree with the majority's conclusion that the district court correctly applied Ohio law to determine the enforceability of the covenant not to compete with respect to the Louisiana,[1] Maryland and South Carolina salesmen. I dissent in part.

Appellee Barnes Group, Inc., is a Delaware corporation with its principal place of business in Connecticut. Bowman is a division of Barnes Group, Inc., and is headquartered in Cleveland, Ohio. Bowman is engaged in the nationwide marketing of some 14,000 items, including washers, nuts, bolts, and related products for the repair of vehicles and machinery. It sells its products primarily through independent contractors. The contracts between Bowman and its contractors contain a non-competition covenant and provide that it "shall be construed in accordance with the laws of the State of Ohio."

Between 1977 and 1979, six Bowman salesmen left Bowman and took a sales or management position with C & C Products, Inc., (C & C), an Ohio corporation and Bowman competitor also having its principal place of business in Cleveland. These salesmen included S.D. Richardson, George Maria, and Roy E. McGuire. S.D. Richardson, a Louisiana resident assigned part of Louisiana as his Bowman territory, was hired by C & C and assigned a territory which overlapped with most of his former territory. George Maria, a Maryland resident and Bowman contractor for the District of Columbia and part of Maryland, was hired by C & C and assigned a territory covering part of Maryland, the District of Columbia, and nearby northern Virginia which had previously been covered by another C & C salesman. Roy E. McGuire, a South Caroli-

na resident selling in the central part of the state for Bowman, was hired by C & C as a district manager primarily to recruit, train, and manage salesmen throughout South Carolina.

On October 26, 1979, Barnes Group, Inc., instituted this diversity action against C & C and Roy E. McGuire in the United States District Court for the Northern District of Ohio alleging that C & C had tortiously interfered with contracts between Bowman and some of its present and former sales agents, and that McGuire had breached the covenant not to compete contained in his contract. Pursuant to 28 U.S.C. § 1404(a), this action was transferred to the United States District Court for the District of South Carolina, because the claim "appears to have occurred in South Carolina and other Southeastern states." Applying Ohio law to determine the enforceability of Bowman's covenant not to compete and to determine Bowman's claim of tortious interference, the district court sitting in South Carolina found for Bowman.

The South Carolina district court, as transferee, was required to apply the same law as the transferor court in Ohio. *Kline v. Wheelsby Kinney, Inc.*, 464 F.2d 184, 185 (4th Cir.1972). This being a diversity action, the transferor court would have applied Ohio substantive law, including its choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Ohio would apply the law of the state chosen by the parties to govern their contract unless

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue

1. Whether the district court applied the wrong law in determining the enforceability of the Louisiana salesman's covenant does not affect the disposition of this case, since Louisiana does not recognize a cause of action for tortious interference in contractual relations.

*Brinkley & West, Inc. v. Foremost Insurance Co.*, 499 F.2d 928, 933–34 (5th Cir.1974). I mention my views pertaining to the law applicable to the Louisiana salesman's covenant only for the purpose of explaining fully and clearly my analysis of this case.

and which, ... would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws* § 187(2)(b) (1971). *See S & S Chopper Service, Inc. v. Scripter,* 59 Ohio App.2d 311, 394 N.E.2d 1011 (1977); *Woelfling v. Great-West Life Assurance Co.,* 30 Ohio App.2d 211, 285 N.E.2d 61 (1972).

The majority concedes that there are no Ohio cases which address whether the enforceability or non-enforceability of a covenant not to compete involves a policy sufficiently weighty to be considered "fundamental." The majority further acknowledges that "there can be no clear-cut delineation of those policies that are sufficiently 'fundamental' ... to warrant overriding a contractual stipulation of controlling law" and relies upon usury cases for the proposition that a state's "fundamental policy" is not impinged upon if the contractually chosen law differs only in minor respects from the law that would apply absent the choice of law. At 1030. Although choice-of-law provisions have been enforced so as to validate interest rates that would be usurious in the state whose law would apply absent the choice-of-law provisions, at least one court has applied a strong public policy on usury and rejected contrary, state usury laws. *Huchingson v. Republic Finance Company, Inc.,* 236 Ark. 832, 370 S.W.2d 185 (1963). In any event, I do not find usury cases to be controlling in this case which involves the enforceability of a restrictive covenant in employment contracts. In my view, the instant case is more analogous to insurance cases, where the oppressive use of superior bargaining power by the insurance company against the insured may be present, than to usury cases. *See generally Restatement (Second) of Conflicts* § 187 comment g. Accordingly, I conclude that a contract which prevents an individual from earning his livelihood and which restrains competition involves "fundamental policy." Based upon the facts of this case, I further conclude that the Ohio Supreme Court would defer to the superior interest of the states where the independent contractors resided, worked, executed the contracts,

and engaged in the acts about which Bowman complains. *See Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123 (S.D.Ala. 1978), *aff'd,* 599 F.2d 743 (5th Cir.1979).

Under Ohio law, a covenant not to compete is enforceable if reasonable. *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975). The majority acknowledges that this test concerning the enforceability of restrictive covenants is not the same as the tests applied under the laws of Maryland and South Carolina.

For an employee in Maryland to be covered by a restrictive covenant, he must perform "unique" services or have received valuable trade secrets. *E.L. Conwell & Co. v. Gutberlet,* 429 F.2d 527 (4th Cir.1970); *Budget Rent-a-Car v. Rapp,* 268 Md. 478, 302 A.2d 11 (1973). In South Carolina, non-competition covenants in employment contracts are critically examined and construed against the party imposing them because they are "generally disfavored." *Sermons v. Caine & Estes Ins. Agency, Inc.,* 275 S.C. 506, 273 S.E.2d 338, 339 (1980); *Almers v. S.C. Nat'l Bank of Charleston,* 265 S.C. 48, 217 S.E.2d 135 (1975). The test for enforceability is (1) reasonable duration and (2) protection of some legitimate business interest. *Almers v. S.C. Nat'l Bank of Charleston, supra; Standard Register Co. v. Kerrigan,* 238 S.C. 54, 119 S.E.2d 533 (1961). In Ohio, by contrast, these requirements of Maryland and South Carolina law are simply factors to be considered in assessing reasonableness. *Raimonde v. Van Vlerah, supra,* 325 N.E.2d at 547.

Accordingly, I would remand this case with respect to the Maryland and South Carolina salesmen for specific findings whether the covenant is valid and enforceable in those states.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I.

All of us agree that Ohio's choice of law principles should be dispositive of whether Ohio's or another state's substantive law

should apply in determining the validity of the restrictive covenant at issue here. Although the point is less eminently clear, it appears that Ohio would look to the *Restatement (Second) of Conflict of Laws* and to the general theory of interest analysis contained therein in applying its own choice of law rules. Consequently, where I part ways with my panel colleagues is simply as to the proper application of those principles to the case before us.

Clearly, Ohio law should not be construed so as automatically to accept whatever law the parties contract to apply. Nevertheless, the basic premise behind the *Restatement*'s treatment of contractual statements of mutual preference as to applicable law is that giving force to the parties' choice of law is the rule rather than the exception:

> Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured. Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.... [T]he demands of certainty, predictability and convenience dictate that, subject to some limitations, the parties should have power to choose the applicable law.

*Restatement (Second) of Conflict of Laws* § 187 comment e (1971). There is no question that here there is a clear and effective choice of Ohio law by the parties, and no challenge has been directed to the validity of the choice of law term in the contract.

Rather, the majority concludes that one of two limitations on the rule of *Restatement* § 187 applies here. The first limitation of § 187 is that the chosen state must have a "substantial relationship to the parties or the transaction" or there must be some other "reasonable basis for the parties' choice." *Restatement, supra,* § 187(a). Here it is not denied that Ohio has both a substantial relationship to the parties, and a very reasonable basis for being the chosen state.[1]

Second, § 187(2)(b) counsels against enforcement of contractual choices of law where

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The requirement of a materially greater interest in the competing state in determining the issue, and the stipulation that the competing state would be the state of applicable law in the absence of a contractual choice actually amount, as a practical matter, to one and the same requirement. Section 188 establishes that, in the absence of an effective contractual choice, the state having the most significant relationship to the transaction and parties will be that whose local law is applied to the dispute. Various contacts, including the place of contracting, the place of negotiation, the place (or places) of performance, the location of the subject matter of the contract, and the domicile, place of incorporation, etc. of the parties are to be considered, and the weight of each contact is to be evaluated according to its relative importance vis-à-vis the contractual issue in dispute. Section 188 also

---

1. Bowman was not engaged in unreasonable state forum-shopping when it chose Ohio law to be applied to its contracts. Ohio was the most logical state for a company based in Ohio to choose to govern its uniform contracts with salespeople in many different states. Indeed, had Bowman chosen to apply a single state's law other than Ohio's to all of its contracts with its salespeople, such a choice would likely have been suspect.

incorporates the general principles of § 6,[2] which are to be used to guide the process of assessing parties' contacts and states' interests in transactions to reach a choice of law. Thus, the state which would satisfy the § 188 test for choice of law in the absence of a contractually expressed preference would inevitably also be the state with the materially greater interest in the resolution of the disputed issue.

The § 187 limitation, then, requires that two facts be shown before the parties' contractual choice of law will be disregarded: that a competing state has a materially greater interest in the issue in dispute than does the contractually chosen state, and that application of the contractually chosen law would violate a fundamental policy of that competing state.

Taking the requirement of the contravention of a fundamental policy first, the majority rightly notes that the inquiry as to whether a fundamental policy exists is by its very nature usually devoid of readily ascertainable and quantifiable results. The opportunity, accordingly, is presented for the fundamental policy exception to the general rule of § 187 to become "an escape valve out of which all the predictability and certainty of the autonomy rule [honoring contractual choices of law] flows" ;[3] the exception may well threaten to swallow the rule.[4] Nevertheless, I am prepared to accept that a state statute which voids covenants not to compete, as does Alabama's

statute,[5] is an expression of a fundamental state policy.

What remains to be shown, then, is whether Alabama has a materially greater interest than does Ohio in the issue of the validity of the covenants not to compete. I do not believe the majority has shown, nor that it can be shown, that Alabama has such a materially greater interest. The crucial steps here are those of reviewing the facts of the case at bar, allotting the contacts to the various states concerned, assessing each state's interest in the resolution of the disputed issue, determining the significance of the former in light of the latter, and doing it all with an eye towards the policy ends expressed in *Restatement (Second) of Conflict of Laws* § 6.[6]

Instead of performing such an analysis, however, the majority merely assumes, without initial analysis or even discussion, that Alabama's interests in the resolution of the issue of the validity of the restrictive covenants are stronger than any "generalized interest" Ohio might have, and leaves it at that. A more careful review should lead to a different result.

*Restatement* § 6 calls for choice of law decisions to be made with the following factors, *inter alia,* in mind:

\* \* \* \* \* \*

(d) the protection of justified expectations,

---

**2.** *Restatement* § 6(2) states that "... the factors relevant to the choice of the applicable rule of law include":
   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
   (d) the protection of justified expectations,
   (e) the basic policies underlying the particular field of law,
   (f) certainty, predictability and uniformity of result, and
   (g) ease in the determination and application of the law to be applied.

**3.** Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy*

*or Objective Determination?,* 82 Colum.L.Rev. 1659, 1673 (1982).

**4.** Here we have a situation where the contacts of Ohio, the mutually selected state, are numerous. That consideration counsels against the application of the fundamental policy exception unless the existence and nature of such a policy is strongly evident:

   The more closely the state of the chosen law is related to the contract and the parties, the more fundamental must be the policy of the state of the otherwise applicable law to justify denying effect to the choice-of-law provision.
*Restatement, supra,* § 187 comment g.

**5.** Alabama Code § 8–1–1(a).

**6.** *Supra,* at n. 2.

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result. . . .

Protection of justified expectations is referred to as "an important value in all fields of law," *Restatement, supra,* § 6 comment g, and is particularly:

> . . . of considerable importance with respect to issues involving the validity of a contract, such as capacity, formalities and substantial validity. Parties entering a contract will expect at the very least, subject perhaps to some rare exceptions, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of a local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied.

*Id.,* § 188 comment b.

The point is further underlined by the *Restatement's* assessment of the basic policies underlying contract law: "Protection of the justified expectations of the parties is the basic policy underlying the field of contracts." *Id.* And finally, the values of certainty, predictability and uniformity of result are closely linked with the protection of parties' expectations that their contractual choice of law will be honored, since ". . . unless these values are attained, the expectations of the parties are likely to be disappointed." *Id.* Clearly, the *Restatement* expresses a strong policy preference for fulfilling contracting parties' justified expectations vis-à-vis their choice of law whenever possible.[7]

A recitation of the contacts of the contracting parties with Ohio and Alabama,

respectively, is revealing. Although Bowman's parent company, Barnes Group, Inc., is incorporated in Delaware with its principal place of business in Connecticut, Bowman's headquarters are located in Ohio. The district judge found that each of the independent contractor salespeople involved in the instant litigation had sent his or her employment applications to Bowman in Ohio, and that Bowman had accepted the applications and executed the sales agreement contracts in Ohio as well. The salespeople received all their sales and training materials from Ohio, and attended a four-day training course there. Business was continually transacted between the independent contractors and Bowman's Ohio headquarters by telephone and by mail; McGuire, the South Carolina salesman, for example, alone called Ohio more than twenty times in the eight months prior to his leaving Bowman. Letters, notes, orders and returned merchandise were frequently sent to Ohio by the salespeople, and weekly sales reports were sent there as well for as long as the salespeople worked for Bowman. Every two weeks salespeople received commission checks sent from Ohio and drawn on an Ohio bank.

Clearly, then, Ohio would be considered the place of contracting, the place of negotiation, and the domicile of one of the parties to the contracts. Likewise, it is too limited a view to conclude that the contracts were performed only in Alabama, Louisiana, Maryland or South Carolina, where the salespeople lived and gathered customers. A bilateral contract is inherently as well as linguistically two-sided, and all of Bowman's contractual obligations were fulfilled in Ohio, in addition to the several aspects of the salespeople's performance which occurred in or involved communication with Ohio. Finally, the location of the

---

7. As a part of the policy, the drafters of the *Restatement* recommended that:

> In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said, subject perhaps to rare exceptions, that they

expected that the provisions of the contract would be binding upon them.

*Restatement, supra,* § 188 comment b. It would be anomalous to presume that the validating state's law would be applied where parties neglect to express their preference, but to refuse to apply it where the parties have made an explicit choice of law.

subject matter of the contract, one to pay persons commissions for the sale of certain products, could be as easily construed to have been in Ohio, where the products and payment originated, as in the other states, where the independent contractors consummated the sales.

When the weight of the contacts is evaluated in light of their relative importance to the contractual issue in dispute, Ohio still emerges as, at the very least, a state with a material interest in the resolution of the case equally as great as that of Alabama.[8] The larger issue here is one of contractual validity; since Ohio is, among other things, the state of execution of the contracts, and overall the state with most of the contacts once one accepts that things must be looked at from the point of view of both of the parties and not just one of them, Ohio obviously has an indefeasible interest in the resolution of the contract's validity. More

narrowly, the validity of the restrictive covenant is at issue. The majority rightly recognizes that the competing states have an interest in protecting their workers and setting local economic policies, but gives short shrift to Ohio's interests in assuring its employers, as far as possible, of uniform enforcement in Ohio courts of valid contracts with out-of-state employees.[9]

Given the strong predisposition of the *Restatement* to honor contractual choices of law wherever possible, its underlying policy goals of furthering predictability and reliability in contractual affairs, the numerous contacts with Ohio in the instant case, and the interest Ohio has in seeing that its employers can assure their employees of evenhanded treatment, the bland assumption simply does not follow that Alabama has a materially greater interest than Ohio in the transaction and dispute before us.[10]

8. Even if the facts point equally to application of Alabama's or Ohio's law, the court should still apply Ohio's law:

> If all of the most significant contacts converge in one state, the court's decision is easy; that state's law should be applied, regardless of a choice-of-law clause. Where the significant contacts point to different states, a court should weigh the strength of each state's interest based upon the contacts relevant to its policy. If the court is still unable to reach a decision, it should err on the side of the parties' expectations, and honor their choice of law.
>
> \* \* \* \* \* \*
>
> If an analysis of the competing policies and contacts leaves a court unable to decide which state's law applies to the contract, the court should apply the law that the parties chose in order to avoid doing violence to their expectations without good reason. The primary policy behind contract law of upholding justified expectations demands this result.

Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?, supra,* n. 3, at 1688–89. *See also Nordson Corp. v. Plasschaert,* 674 F.2d 1371, 1376 (11th Cir.1982) (Because no one of several states had a materially greater interest in the controversy than any other state, the parties' choice of Ohio law enforcing a covenant not to compete should be honored. Although Georgia has a fundamental policy against enforcement of such covenants, and was the state where a "substantial part" of the contract performance was carried out, oth-

er interests outweigh these, and Georgia law should not apply).

9. To do the job completely, we, as a court, must take into account the chaotic employment conditions under which the salespeople for Bowman would have to work if Bowman were unable to treat its workers uniformly. Those in some states would be bound to comply with their contractual undertakings, while others would be free to enjoy substantial advantages, negotiating favorable terms with competitors by which the knowledge and contacts gained through working for Bowman could be diverted to them. Bruised feelings and jealousies would be inevitable. Worse, the restrictive covenant might well, practically speaking, in order to promote tranquility, have to be eliminated in *all* contracts, even those entered into with salespeople working in states which permit such covenants. That, I submit, would be no less an intrusion by one state (Alabama) into another's (Ohio's) law than the result which would give precedence to Ohio substantive law over Alabama law. One of the states must give way, a consideration inherent in the fact that a choice must be made. Ohio, there being multiple contacts with that state, including the citizenship of one of the parties, should receive serious consideration even without the mutual choice by the parties that Ohio law should prevail. With that stated preference, the choice for us is, properly viewed, not even close.

10. *Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123 (S.D.Ala.1978), *aff'd,* 599 F.2d 743 (5th Cir.1979), *cert. denied sub nom. Seibert v.*

I therefore dissent insofar as Alabama substantive law, rather than the law of Ohio, was applied here.

## II.

Turning to the choice of law governing the availability of an action for tortious interference with contract, I regretfully also disagree with the majority's conclusion that *Louisiana* law would apply. I do not quarrel with the conclusion that Ohio would utilize the *Restatement's* interest analysis in choosing the law to govern an issue in tort. Once again, however, a closer analysis of the contacts with each of the two states and their relative weight vis-à-vis the issue at hand leads to the conclusion that Ohio's law ought to apply.

Section 145 of the *Restatement (Second) of Conflict of Laws* outlines the contacts to be considered in determining which state has the most significant relationship to the occurrence and parties in the case of a tort:

  (a) the place where the injury occurred,

  (b) the place where the conduct causing the injury occurred,

  (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

  (d) the place where the relationship, if any, between the parties is centered.

The contacts relevant to the tort action are almost exclusively in Ohio. Bowman has its headquarters in Ohio, and transacted all its business with the six salespeople from that geographic base. C & C, the alleged perpetrator of the tort, is incorporated, domiciled and has its principal place of business in Ohio.[11] It is true that a Louisiana-based C & C employee apparently assisted the former Bowman salesman there to convert his former Bowman customers to C & C. Nevertheless, acknowledging the point, the district court made a finding, not clearly erroneous, that the alleged act of interference with contract was a "corporate decision," formulated and affirmed at the highest levels, which "... was placed, directed and consummated by C & C officials, headquartered in Brook Park, Ohio."[12]

Adoption of the *Restatement's* interest analysis of course precludes the automatic use of *lex loci delicti* as a choice of law rule, as the majority rightfully notes. Nonethe-

---

*Baptist,* 446 U.S. 918, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980), cited by the majority, is distinguishable in a controlling way from the case at bar and does not support a conclusion that Alabama's interests outweigh Ohio's here. In *Blalock,* a covenant not to compete stipulated that Pennsylvania law was to apply, Pennsylvania having been the principal place of business of the employer company. By the time litigation had begun, however, things had changed: the employer as always was incorporated in Delaware, but had its principal place of business in New Jersey, while the employee lived in Alabama. It was ambiguous where the contract had been executed. On the facts, the court found that Alabama's interest outweighed that of Pennsylvania, which no longer retained any connection with the transaction. Here, to the contrary, however, Ohio retains the interest stemming from Bowman's domicile and activities there and from the negotiation, execution and conduct of the contract there. Since the interest analysis is so closely dependent upon the facts of each case, *Blalock* cannot be controlling here.

**11.** The fact ... that one of the parties is domiciled or does business in a given state will

usually carry little weight of itself. On the other hand, the fact that the domicile and place of business of all parties are grouped in a single state is an important factor to be considered in determining the state of applicable law. The state where these contacts are grouped is particularly likely to be the state of the applicable law if either the defendant's conduct or the plaintiff's injury occurred there.

*Restatement, supra,* § 145 comment e.

**12.** The drafters of the *Restatement* recognized, in giving importance to the factor of where the injury occurred, that "... persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury." *Restatement, supra,* § 145, comment e. In addition, in cases of intangible torts similar to interference with contract (*e.g.,* misappropriation of trade values), the drafters noted that "... the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities ..." arising from such tortious action. *Restatement, supra,* § 146 comment f.

less, the place where the injury occurs, as the original *Restatement* had defined *lex loci delicti,* is anything but irrelevant to an interest analysis. Here, the injury undoubtedly resulted in Ohio. The very point of a restrictive covenant in an employment contract is to allow an employer to protect itself from the loss of its sales techniques, personnel, information and customers to competitors. Bowman's cause of action was predicated on the theory that C & C's actions caused just such a loss, and Ohio is the only locale in which the loss could have been felt.

Ohio's dual interest in the occurrence here is likewise paramount. "... [A] state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." *Restatement, supra,* § 145 comment c. Such an interest can only be intensified when the injured party is not merely present, but domiciled in Ohio, and when the perpetrator is both resident and citizen of Ohio. C & C Products is an Ohio citizen, and making its practices towards a fellow denizen of that state conform with Ohio law is a reasonable, indeed desirable, interest. Thus, the drafters concluded that "... subject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection." *Id.*

The nature of the particular tort alleged here surely does not diminish in any way Ohio's interest in the matter; if anything, its planned and intentional character only strengthens Ohio's interest in prevention, and its commercial character links it to the state's larger interest in regulating its business community. Louisiana's comparatively minor interest in preventing the maintenance of a cause of action between two Ohio parties for interference with a contract to which a Louisiana resident was a party cannot be of the same magnitude as Ohio's interests.

The majority cites no cases which compel the conclusion that Louisiana law must apply. *Brinkley & West, Inc. v. Foremost Insurance Co.,* 499 F.2d 928 (5th Cir.1974) does indeed stand for the proposition that Louisiana does not recognize a cause of action for tortious interference with contract. But the case provides no support for the proposition that Louisiana's interests necessarily outweigh Ohio's in the case at bar.

The facts in the *Brinkley* case were that a Louisiana corporation claimed an exclusive relationship as agent for a Michigan corporation doing business in Louisiana. The agent corporation in turn dealt with subagents in numerous states. The agent corporation asserted that the principal had induced the subagents to break their contracts with the agent by doing business directly with the subagents. The action was brought in federal district court in Louisiana. The district judge dismissed the claim, reasoning that by the rule of *lex loci delicti* Louisiana law should apply, and Louisiana recognized no such cause of action.

Before the Court of Appeals could rule on the issue, however, the Louisiana Supreme Court overturned the doctrine that *lex loci delicti* should govern to determine the applicable law,[13] and the Court of Appeals interpreted the remainder of the Louisiana Supreme Court's opinion to say that Louisiana would instead resort to the *Restatement*'s interest analysis. Thus, the Court of Appeals reversed and remanded the case for trial on the merits, rejecting the argument that Louisiana law would necessarily apply.

The Court of Appeals acknowledged that Louisiana had some connection with the alleged tort, since it had a strong domestic interest in protecting its labor force from the restrictions on employment mobility inherent in allowing such an action. Yet the court equally noted the policy extant in every other state involved (those in which the subagents were domiciled) to allow such causes of action, and the underlying goal of those other states of protecting commercial

**13.** *Jagers v. Royal Indemnity Co.,* La., 276    So.2d 309 (1973).

expectations within and without their borders. The court therefore concluded that a Louisiana court would have had to consider those strong interests, and in fact that the Louisiana court would have found

> ... a way to vindicate these almost universally recognizable rights. It would not hold that the Louisiana geneology [sic] of a rule springing from the highly personalized relationship of master and servant would compel it to carry this over to defeat a claim for tortious interference of a modern, more complex commercial arrangement.

*Brinkley, supra,* at 935.

Though the case might arguably be deemed to give greater weight to the interests of the state of the subagents' residence than to those of the state of the other two parties, the much stronger message seems to be that Louisiana would not allow its own restrictive law to prevent the vindication of rights through a cause of action recognized in sister states. If Louisiana itself would not so restrict its sister states, Ohio would hardly do so in the name of applying Louisiana law.

Accordingly, on the issues of whether, in competition with Ohio, Alabama's or Louisiana's law should apply, I dissent and would rule that, in both instances, Ohio's substantive law should apply. Nothing suggests that it should not also apply for any other jurisdictions whose law might hereafter have to be considered. Accordingly, I disagree with the conclusion that the scope of injunctive relief was too broad. On all other issues decided by the majority, I concur.