[Cite as *Reynolds v. Reynolds*, 2021-Ohio-2140.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Peter G. Reynolds                                   Court of Appeals No. L-20-1098

    Appellee/Cross-appellant                   Trial Court No. DR2017-0867

v.

Patricia L. Reynolds                               **DECISION AND JUDGMENT**

    Appellant/Cross-appellee                   Decided:  June 25, 2021

* * * * *

Sheldon Slaybod, for appellee/cross-appellant

John V. Heutsche, for appellant/cross-appellee.

* * * * *

**ZMUDA, P.J.**

## I.    Introduction

{¶ 1}  In this divorce action, appellant/cross-appellee, Patricia Reynolds, appeals

the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division,

issuing a divorce decree that dissolves appellant's marriage to appellee/cross-appellant,

Peter Reynolds, makes provision for the care and custody of the parties' minor children,

divides the marital estate, and awards appellant spousal support. Finding no error in the trial court's judgment, we affirm.

## A. Facts and Procedural Background

{¶ 2} The parties to this action were married in New Hampshire on May 5, 2000. Over the course of their marriage, the parties adopted two children, S.R. and J.R., who were both minors during the pendency of this action.

{¶ 3} On October 16, 2017, appellee filed his complaint for divorce. In his complaint, appellee alleged that he and appellant executed an antenuptial agreement on April 14, 2000, three weeks prior to their wedding. Appellee attached the antenuptial agreement to the complaint and asked the trial court to adopt the terms set forth therein. On November 2, 2017, appellant filed her answer to appellee's complaint. In her answer, appellant acknowledged the existence of the April 14 antenuptial agreement, but challenged its validity.

{¶ 4} Thereafter, the trial court issued temporary orders concerning the parties' children and finances and appointed a guardian ad litem for the children, and the matter proceeded through pretrial discovery and motion practice. On January 29, 2019, appellee filed a motion for partial summary judgment, in which he argued, in part, that the parties' antenuptial agreement was valid and enforceable. Appellee also requested that the court determine that the property covered by the antenuptial agreement and the property he received as an inheritance from his father in 2012 was his separate property. Further, appellee moved the court to determine that certain real and personal property he acquired

2.

during the marriage was his separate property because it was traceable to his separate property from the antenuptial agreement and the 2012 inheritance.

{¶ 5} On March 27, 2019, the trial court issued its decision on appellee's motion for partial summary judgment. In its decision, the court noted that appellant did not file a memorandum in opposition to appellee's motion. The court found that the antenuptial agreement was signed by appellee on April 14, 2000, and then separately executed by appellant six days later. The court further found that the agreement was modified from its original form prior to execution as a result of negotiations between the parties, and noted that each party was represented by an attorney at the time of execution.

{¶ 6} The court, construing the antenuptial agreement, took note of the choice of law language contained in the agreement, which provides that the agreement "shall be governed, controlled and interpreted under the laws of the State of New Hampshire." The court went on to examine New Hampshire law, under which antenuptial agreements are presumed valid. The court applied this presumption, concluded that appellant did not overcome that presumption, and found that both parties entered into the agreement voluntarily after full disclosure was made as to the assets owned by each party at the time of the agreement's execution. Given the uncontested evidence relating to the execution of the antenuptial agreement by the parties, the court also stated that the antenuptial agreement was valid and enforceable under the law of Ohio, where such agreements are not presumed valid. Thus, the court determined that the antenuptial agreement was valid and enforceable with respect to the separate property of the parties, as set forth in

3.

two exhibits attached to the antenuptial agreement. The court refused to enforce the antenuptial agreement provisions relating to spousal support due to the "passage of time and the open question of the change in circumstances." The court went on to hold that appellee was entitled to "all property listed in Exhibit B that he can identify and has possession of or can trace the proceeds from the sale of such property to currently held assets." However, the court refused to classify certain real and personal property appellee acquired during the marriage as his separate property on summary judgment, because it took issue with the affidavit appellee submitted in support of his motion on that issue.

{¶ 7} Following lengthy discovery, the matter proceeded to trial on the following contested issues: (1) allocation of parental rights and responsibilities with respect to the parties' children; (2) division of marital assets and liabilities; (3) appellee's alleged financial misconduct; (4) appellant's entitlement to spousal support; and (5) appellant's entitlement to attorney fees.

{¶ 8} During the multi-day trial, appellee called five witnesses, appellant called two witnesses, and both appellee and appellant testified. Following two days of trial, the parties agreed as to distribution of various items of personal property, both marital and separate, along with a distributive payment from appellee to appellant in the amount of $42,000. The parties prepared a consent judgment entry memorializing this agreement, which was incorporated into the trial court's decision and judgment entry of divorce. The matter then proceeded through two additional days of trial. At the conclusion of the trial,

4.

on May 19, 2020, the trial court issued a 47-page decision resolving the five contested issues and granting the parties a divorce.

{¶ 9}   First, the trial court addressed the allocation of parental rights and responsibilities over the children.  The trial court named appellant as the residential parent and legal custodian of the children, made her responsible for making the non-emergency medical decisions for the children, and awarded appellee weekly parenting time.  The trial court determined that appellant's annual income was $90,588 and appellee's annual income was $332,184, which generated an amount of monthly child support in the amount of $2,340.26 under the Ohio Child Support Computation worksheet.  However, the trial court found this amount to be "unjust, inappropriate and not in the children's best interest," based upon the children's lifestyle, the fact that the parents would be sharing extracurricular expenses and fees, and since each parent would be responsible for providing clothing for the children.  After taking these factors into consideration, the trial court reduced the child support amount, and ordered appellee to pay monthly child support in the amount of $2,040. Additionally, the trial court ordered appellee to continue to pay for J.R.'s private school tuition.

{¶ 10} Next, the trial court classified and divided the marital assets and liabilities. At the outset, the trial court reiterated its prior determination that the parties' antenuptial agreement was valid and enforceable, and proceeded to examine the parties' assets and liabilities in accordance with that determination.  The court found that the property listed on Exhibit B to the antenuptial agreement, as well as other property traceable to the

5.

property listed on that exhibit, would be classified as appellee's separate property.[1]  Later in its decision, the trial court expressly incorporated the terms of its decision on appellee's motion for partial summary judgment into its decision and judgment entry of divorce.

{¶ 11} Specifically, the court found that real property in Kewadin, Michigan (the "Torch Lake property"), was purchased and improved using appellee's non-marital property, and was therefore awarded to appellee.[2]  Likewise, the trial court awarded the parties' property in Newbury, New Hampshire (the "Lake Sunapee property") to appellee, finding that it was purchased with a down payment of non-marital funds and renovated using non-marital funds.  However, the trial court found that the appreciation in these properties' values ($109,270 and $338,976, respectively) was marital property subject to division.

{¶ 12} The court also reviewed the classification of the parties' marital residence located on Somerset Road in Perrysburg, Wood County, Ohio (the "Mansion"), which was listed for sale at the time of the trial court's decision.  The court stated that the net sale proceeds from the sale of the Mansion, less $30,000 attributable to the down payment appellee made using his separate funds at the time of purchase, would be subject

---

[1] The property listed on Exhibit B included real estate, brokerage accounts, motor vehicles, cash, retirement funds, and personal property, all of which had a combined value of $1,045,980.
[2] The trial court also classified as appellee's separate property a storage unit, two Honda jet skis, a Sea Ray boat, a dock, and a lift, all of which was located on the Torch Lake property and purchased using appellee's non-marital funds.

6.

to division as a marital asset. Moreover, the trial court ordered the parties to "reach agreement as to the particulars of the sale" of the Mansion within 30 days of its decision and memorialize that agreement in a consent judgment entry. The court notified the parties that it would appoint a receiver to dispose of the Mansion if such an agreement was not reached, and it retained jurisdiction over the matter.

{¶ 13} Turning to the parties' marital debt, the trial court found, consistent with affidavits filed by the parties, that appellee's total credit card debt and debt from loans taken from his retirement 401(k) plan was $95,000. The court further found that appellant's credit card debt and consolidation loans totaled $61,365. Based upon the nature of the debt, the duration of the marriage, the income of the parties after the application of spousal support, and its finding that appellee was the party who was financially responsible to care for the family home and the children during the marriage, the trial court ordered that "each party be responsible for their own individual debt and hold the other harmless therefrom."

{¶ 14} Finally as it relates to the division of marital assets and liabilities, the trial court divided the marital assets equally between the parties. In order to accomplish this equal division, the trial court ordered appellee to execute a note and mortgage in appellant's favor in the amount of $266,583.[3]

---

[3] After dividing the marital assets and liabilities, the trial court turned to the issue of appellee's alleged financial misconduct, which is not at issue in this appeal. The trial court found no evidence in the record to establish that appellee's actions caused appellant

7.

{¶ 15} Next, the trial court examined the issue of spousal support in light of the record. For her part, appellant requested support in the amount of $12,000 per month for an unspecified period. She reasoned that such a request was proper in light of the duration of the marriage, the disparity in the parties' incomes and earning abilities, her disability, and her support of appellee's advancement in his career to the position of senior captain for Delta Airlines. The court thoroughly examined the parties' finances and health conditions, and found that appellant was unlikely to be able to secure employment prior to reaching retirement age due to her disability, her age (60 years old at the time of the court's decision), and the passage of time since she exited the job market. In explaining its spousal support decision, the trial court stated:

> While the Court considered all statutory factors in determining a reasonable and appropriate spousal support amount and the duration thereof, the Court was particularly influenced by the age and health of each party, the standard of living established during the marriage, that [appellant] sacrificed her career in raising the children and assisting [appellee] in advancing his career, that [appellant] has limited employability because of her disability, that [appellee's] employment as a captain in the airline industry clearly exceeds [appellant's] earning capacity and ability, [appellee's] payment of

to sustain any financial losses, and thus rejected appellant's claim of financial misconduct.

temporary living expenses since November 2017, and the two decades duration of the marriage.

{¶ 16} Upon consideration of the foregoing, the trial court ordered appellee to pay spousal support in the amount of $5,500 per month until appellant's death, remarriage, or cohabitation with another as if married, whichever occurs first. However, the court delayed the first support payment until the first day of the month following the sale of the Mansion, and ordered appellee to continue the temporary support orders that were previously put in place by the trial court pursuant to Civ.R. 75(N) until such time as the Mansion was sold.

{¶ 17} Further, the court directed that the spousal support order would survive appellee's death due to the duration of the marriage, appellant's age, physical condition, and work history, the ages of the children, and the amount of spousal support. In order to insure support payments to appellant in the event that appellee predeceases her, the trial court ordered appellee to "designate [appellant] as the beneficiary of the Delta Airlines Term Life Insurance Policy until further order of the Court," and to provide proof of such designation upon reasonable request. The court went on to state that "[f]ailure to maintain sufficient life insurance coverage shall entitle [appellant] to make a claim against [appellee's] estate."

{¶ 18} Finally, the trial court addressed appellant's request for attorney's fees in the amount of $60,000. The trial court found that appellant had produced no evidence to support her request, and denied the same.

9.

{¶ 19} Upon receipt of the trial court's decision and judgment entry of divorce, appellant filed her timely notice of appeal. One week later, appellee filed a timely notice of cross-appeal. The matter is now decisional.

## B. Assignments of Error

{¶ 20} On appeal, appellant assigns the following errors for our review:

I. The trial court erred, as a matter of law and to Appellant's prejudice, by applying New Hampshire law in interpreting the antenuptial agreement.

II. The trial court erred, as a matter of law and to Appellant's prejudice, by failing to include all appellee's income for computing child support and by including income for Patricia that should have been excluded.

III. The trial court erred, as a matter of law and to Appellant's prejudice, by failing to make findings of fact, as required under O.R.C. § 3119.22, to support the deviation.

IV. The trial court erred, as a matter of law and to Appellant's prejudice, by failing to award Patricia current spousal support and by failing to provide an adequate award.

V. The trial court erred, as a matter of law and to Appellant's prejudice, by ordering each to pay their own debt and hold the other harmless thereon.

10.

{¶ 21} For his part, appellee/cross-appellant assigns the following errors for our review:

I. The trial court committed prejudicial error and abused its discretion by entering a spousal-support award of indefinite duration that (A) survives Peter's death, (B) lasts until Patricia's death, and (C) is not subject to modification after Peter's death regardless of how long Patricia lives and regardless of the assets and changed circumstances of Peter's estate.

II. The trial court committed prejudicial legal error and abused its discretion by entering an order that cedes to Patricia the ability to determine Peter's financial obligations related to Peter's obligation to pay private school tuition without conditions or modification regardless of Peter's financial circumstances.

## II. Analysis

### A. Antenuptial Agreement

{¶ 22} In her first assignment of error, appellant argues that the trial court erred by deciding, on summary judgment, that New Hampshire law applies to the parties' antenuptial agreement.

{¶ 23} Summary judgment is proper under Civ.R. 56(C) when: (1) no genuine issue as to any material fact exists; (2) the party moving for summary judgment is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the

11.

nonmoving party, reasonable minds can only reach one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). On appeal, we review a decision granting or denying summary judgment de novo. *State ex rel. Sunset Estate Properties, L.L.C. v. Lodi*, 142 Ohio St.3d 351, 2015-Ohio-790, 30 N.E.3d 934, ¶ 6. Furthermore, appellate courts apply a de novo standard of review to a trial court's choice-of-law determination and its interpretation of a written contract. *Woodside Mgt. Co. v. Bruex*, 157 N.E.3d 295, 2020-Ohio-4039, ¶ 18 (9th Dist.), citing *Nationwide Mut. Fire Ins. Co. v. Rose*, 9th Dist. Lorain No. 05CA008814, 2007-Ohio-1216, ¶ 7, and *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 38.

{¶ 24} Here, appellant argues that the parties' antenuptial agreement should be governed by the law of the place of performance rather than the place of formation of the agreement. In support of her argument, appellant cites a case in which the Cuyahoga County Court of Common Pleas examined the validity of an antenuptial agreement executed in Massachusetts, and applied Ohio law. *Osborn v. Osborn*, 10 Ohio Misc. 171, 176, 226 N.E.2d 814 (Cuyahoga C.P.1966). There, the trial court recognized the general rule that "questions relating to the validity of a contract are governed by the law of the place of performance rather than the place of making," and determined that Ohio law was the appropriate choice of law. *Id.*

{¶ 25} Notably, the court in *Osborn* was not presented with an antenuptial agreement that contained an express choice of law provision, like the one at issue in the

12.

present case. In *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 453 N.E.2d 683 (1983), the Supreme Court of Ohio addressed the validity of such provisions, and adopted the Restatement of the Law 2d, Conflict of Laws, Section 187(2) at 561 (1971), which provides:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

{¶ 26} Applying the foregoing to this case, we find no merit to appellant's contention that Ohio law, and not New Hampshire law, should govern the parties' antenuptial agreement. The choice of law provision in the agreement selects New Hampshire law, and neither of the Section 187(2) exceptions is applicable in this case. The parties were married in New Hampshire and continued to hold real estate in New

13.

Hampshire during the pendency of this divorce action. Thus, the parties continue to have a substantial relationship to New Hampshire.

{¶ 27} Moreover, application of New Hampshire law is not contrary to a fundamental policy of Ohio as to the validity of antenuptial agreements. Indeed, such agreements are valid in both states, and the only difference between the two states is whether the agreements are *presumed* valid. The trial court below held that the antenuptial agreement in this case would be valid *even without* the presumption that the agreement enjoys under New Hampshire law. The evidence that was before the trial court at the time of its decision supports the court's conclusion.

{¶ 28} Under Ohio law, antenuptial agreements "'are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce.'" (citations omitted.) *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 466, 628 N.E.2d 1343 (1994).

{¶ 29} At her deposition in this case, appellant admitted that appellee first told her that he was working on the agreement "a couple months before the wedding," and that she hired an attorney to look over the antenuptial agreement and give her his opinion. Appellee discussed the agreement with her attorney and began negotiating with appellant as to its terms. Appellant ultimately signed the agreement outside the presence of appellee on April 20, 2000, approximately two weeks prior to the parties' wedding.

14.

Appellant stated that she signed the agreement against her attorney's advice, because she was in love with appellee and many of the wedding guests had already arrived from out of town to attend the wedding.

{¶ 30} On this record, we find that the trial court did not err in concluding that the parties' antenuptial agreement would be valid and enforceable even under Ohio law. Appellant was presented with the antenuptial agreement prior to the wedding, and she consulted on the matter with her own private attorney prior to marrying appellee. Therefore, it is evident that appellee made full disclosure of the antenuptial agreement well before the execution of the agreement. Further, appellee did not exert any improper influence over appellant prior to her execution of the antenuptial agreement. Indeed, appellant executed the agreement outside of appellee's presence. Finally, appellant does not argue, and we do not find, that the antenuptial agreement promotes or encourages divorce. Thus, the antenuptial agreement is valid and enforceable even under Ohio law.

{¶ 31} In light of the express choice of law provision in the parties' antenuptial agreement identifying New Hampshire law as the governing law, and in light of our agreement with the trial court that the agreement would be valid even under Ohio law, we find no merit to appellant's arguments under her first assignment of error. Accordingly, appellant's first assignment of error is not well-taken.

**B. Child Support Issues**

{¶ 32} In her second assignment of error, appellant argues that the trial court erred by failing to include all of appellee's income in its computation of child support and by

including portions of her income that should have been excluded. Relatedly, in her third assignment of error, appellant contends that the trial court erred by failing to make findings of fact under R.C. 3119.22 to support its deviation from the computed amount of child support under the basic child support schedule. Given the interrelationship of these arguments, we will address them simultaneously.

{¶ 33} The trial court's decision on whether to deviate from the statutory support schedule and child support worksheet calculations will not be disturbed absent an abuse of discretion. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989); *Ontko v. Ontko*, 6th Dist. Erie No. E-03-050, 2004-Ohio-3805. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 34} Under R.C. 3119.03, the amount of child support calculated using the basic child support schedule and the applicable worksheet is rebuttably presumed to be the correct amount of child support. However, R.C. 3119.22 permits a trial court to deviate from the basic child support schedule, as follows:

> The court may order an amount of child support that deviates from
> the amount of child support that would otherwise result from the use of the
> basic child support schedule and the applicable worksheet if, after
> considering the factors and criteria set forth in section 3119.23 of the
> Revised Code, the court determines that the amount calculated pursuant to

16.

the basic child support schedule and the applicable worksheet would be unjust or inappropriate and therefore not be in the best interest of the child.

If it deviates, the court must enter in the journal the amount of child support calculated pursuant to the basic child support schedule and the applicable worksheet, its determination that the amount would be unjust or inappropriate and therefore not in the best interest of the child, and findings of fact supporting that determination.

{¶ 35} In completing the standard child support computation worksheet in this case, the trial court determined that appellant's total annual gross income is $90,588, comprised of her annual social security disability benefits ($16,404), annual spousal support ($66,000), and the children's additional annual stipend relating to her disability payment ($8,184). The trial court further found that appellee's total annual gross income is $337,047, comprised of his employment income less annual union dues and uniform expenses. The trial court then adjusted appellee's income downward by $74,463 to reflect appellee's payment of spousal support to appellant ($66,000) and out-of-pocket health insurance premiums ($8,463), yielding adjusted gross incomes of $90,588 and $262,584 for appellant and appellee, respectively, and a combined gross income of $353,172.

{¶ 36} Appellant takes issue with these income figures, arguing that the trial court erred by failing to include appellee's mandatory annual distributions from his father's

17.

individual retirement account ("IRA") and earnings from his separate property investments, including $18,000 in rental income from the Lake Sunapee property.

{¶ 37} R.C. 3119.01(C)(9) provides two definitions for "income," depending upon whether the parent is employed to full capacity. When the parent is employed to full capacity, as is appellee in this case, income means "the gross income of the parent." R.C. 3119.01(C)(9)(a). The following definition of "gross income" is provided under R.C. 3119.01(C)(12):

> (12) "Gross income" means, except as excluded in division (C)(12) of this section, the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses to the extent described in division (D) of section 3119.05 of the Revised Code; commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; disability insurance benefits; benefits that are not means-tested and that are received by and in the possession of the veteran who is the beneficiary for any service-connected disability under a program or law administered by the United States department of veterans' affairs or veterans' administration; spousal support actually received; and all other sources of income. "Gross

18.

income" includes income of members of any branch of the United States armed services or national guard, including, amounts representing base pay, basic allowance for quarters, basic allowance for subsistence, supplemental subsistence allowance, cost of living adjustment, specialty pay, variable housing allowance, and pay for training or other types of required drills; self-generated income; and potential cash flow from any source.

{¶ 38} "The statutory definition of income is very broad and includes income from trusts, as well as potential cash flow from any source." *Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, 855 N.E.2d 533, ¶ 50 (2d Dist.). Given this expansive definition of "gross income," we agree with appellant that the trial court should have included appellee's IRA income and investment income from his separate property in its calculation of appellee's income. However, we find that this error was harmless for the following reasons.

{¶ 39} Effective March 28, 2019, the basic child support schedule established pursuant to R.C. 3119.021 lists a maximum annual income of $336,467.04. This maximum annual income is less than the parties' combined annual income in this case, even if appellee's additional IRA income and investment income is excluded.

{¶ 40} When the combined annual income of both parents is greater than the maximum annual income listed on the basic child support schedule, R.C. 3119.04 applies, and provides:

19.

If the combined annual income of both parents is greater than the maximum annual income listed on the basic child support schedule established pursuant to section 3119.021 of the Revised Code, the court, with respect to a court child support order, * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court * * * shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined annual income equal to the maximum annual income listed on the basic child support schedule established pursuant to section 3119.021 of the Revised Code, unless the court or agency determines that it would be unjust or inappropriate and therefore not in the best interest of the child, obligor, or obligee to order that amount. If the court * * * makes such a determination, it shall enter in the journal the figure, determination, and findings.

{¶ 41} Under R.C. 3119.04, the trial court generally cannot issue an order that is less than the obligation that would have been computed under the basic worksheet for gross income of $336,467. In other words, "the amount computed under the child support worksheet for gross income of [$336,467] is generally the floor but not the ceiling of the potential range of child support." *V.C. v. O.C.*, 8th Dist. Cuyahoga No.

20.

109988, 2021-Ohio-1491, ¶ 79, citing *Graham v. Graham*, 2020-Ohio-1435, 153 N.E.3d 843, ¶ 11 (3d Dist.). However, the trial court may impose a lesser child support obligation if it determines that it would be unjust or inappropriate and, therefore, not in the best interest of the child or either parent to order the higher amount, and includes such a finding in its journal entry. *Id.*

{¶ 42} At the maximum annual gross income of $336,467, the annual amount of child support for two children under the child support worksheet contained in R.C. 3119.04 is $34,519.45. In its decision and judgment entry of divorce, the trial court calculated monthly child support attributable to both parties in the amount of $36,253.74 using the child support computation worksheet. However, the trial court found this amount to be "unjust, inappropriate and not in the children's best interest," based upon the children's lifestyle, the fact that the parents would be sharing extracurricular expenses and fees, and since each parent would be responsible for providing clothing for the children. Thus, the trial court reduced the child support amount, and ordered appellee to pay annual child support in the amount of $24,000, plus a two percent processing fee.

{¶ 43} The factors cited by the trial court in its decision and judgment entry of divorce may be taken into consideration by a trial court when fashioning a child support award that deviates from the amount set forth in the child support schedule under R.C. 3119.021. *See* R.C. 3119.23(I) and (K). While such factors do not expressly apply to a trial court's child support award under R.C. 3119.04, we find that a trial court may, in its

21.

discretion, take such factors into consideration when determining what amount of child support would be in the children's best interests.

{¶ 44} Having reviewed the record and the trial court's decision and judgment entry of divorce, we conclude that the trial court engaged in the case-by-case analysis required under R.C. 3119.04. Acting within its discretion to fashion a child support award tailored to the facts of this case, the trial court considered the factors it deemed relevant, and determined that a reduced child support award was appropriate and in the children's best interests. Moreover, the trial court articulated its findings to support its reduction of child support, as required under R.C. 3119.04. Appellant does not challenge these findings, but instead argues that the trial court did not make such findings. This argument is belied by the record and the express language contained in the trial court's decision and judgment entry of divorce.

{¶ 45} Accordingly, we find appellant's second and third assignments of error not well-taken.

### C. Spousal Support Issues

{¶ 46} In her fourth assignment of error, appellant argues that the trial court erred by failing to award her current spousal support and by failing to provide an adequate award.

{¶ 47} Trial courts generally enjoy broad discretion to determine spousal support issues. *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990). Accordingly, we

22.

will not reverse a trial court's spousal support decision absent an abuse of discretion. *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108 (1997).

{¶ 48} A trial court, when addressing the issue of spousal support in a divorce proceeding, is guided by the provisions set forth in R.C. 3105.18, which authorizes the court to "award reasonable spousal support to either party" upon the party's request and after the court divides the property under R.C. 3105.171. In addition, the trial court may award the requesting party reasonable temporary spousal support during the pendency of the divorce. R.C. 3105.18(B). In determining whether an award of spousal support is reasonable and appropriate, and in setting the nature, amount, and terms of payment, and the duration of spousal support, the trial court must consider the list of factors contained in R.C. 3105.18(C)(1) and must do so under the assumption that each party contributed equally to the production of marital income.

{¶ 49} Here, appellant argues that the trial court abused its discretion when it ordered spousal support of $5,500 per month, "due the first day of the month following the sale/disposition of the Mansion. * * * [A]ll prior temporary orders of the Court, excluding child support, shall continue until an award of spousal support to [appellant] becomes due as stated above." Appellant argues that the trial court erred in continuing the temporary orders that were previously put in place when appellee's monthly living expenses were higher, because "the effect of continuing the [Civ.R. 75(N)] order with no allowance for current spousal support provided [appellee] a windfall increase of the undetermined expenses for the Monclova property he was no longer paying." Further,

23.

appellant contends that the amount of the spousal support was "grossly unfair and unjust," because it constitutes only 23.8 percent of appellee's gross income.

{¶ 50} In framing her argument, appellant appears to misunderstand the purpose of spousal support, which is "to provide for the financial needs of the ex-spouse," not necessarily to equalize the parties' income after divorce. *Moell v. Moell*, 98 Ohio App.3d 748, 751, 649 N.E.2d 880 (6th Dist.1994); *see also Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 23 ("Although there is no prohibition against the equalization of incomes in appropriate cases, income equalization is not a factor that must be considered under R.C. 3105.18(C)(1).").

{¶ 51} Appellant acknowledges in her brief that the trial court "recited that it considered all factors of R.C. 3105.18(C)(1) and detailed its findings on pages 30 through 36 inclusive of the judgment." Our review of the trial court's decision confirms that the court thoroughly considered each of the relevant factors under R.C. 3105.18(C)(1), and applied those factors in light of the facts adduced at trial. In considering these factors, the court expressly examined, among other things, the income disparity between the parties, the property settlement that the parties would receive upon divorce, and the parties' monthly expenses.

{¶ 52} Appellant does not assert that the payments appellee is ordered to make to her or on her behalf under the Civ.R. 75(N) orders are insufficient to provide for her financial needs while the Mansion is still on the market. Neither does appellant explain how the trial court erred in concluding that spousal support of $5,500 per month would be

24.

sufficient to meet her needs after accounting for the property settlement she received pursuant to the divorce.

{¶ 53} It is evident from the trial court's decision and judgment entry of divorce that the court arrived at a spousal support award that it deemed appropriate and reasonable only after thoroughly considering the factors set forth in R.C. 3105.18(C)(1). As noted above, the trial court enjoys broad discretion to fashion spousal support awards. On the record before us in this case, we find that the trial court did not act unreasonably, arbitrarily, or unconscionably in awarding monthly spousal support in the amount of $5,500 to appellant. Therefore, the trial court's spousal support award does not constitute an abuse of discretion, and appellant's fourth assignment of error is not well-taken.

{¶ 54} Also pertaining to the issue of spousal support, appellee argues in his first assignment of error on cross-appeal that the trial court erred in ordering him to pay spousal support for an indefinite duration that survives his death, lasts until appellant dies, and is not subject to modification after his death. While he acknowledges that the trial court has the authority to order indefinite spousal support, and to secure its payment by ordering him to obtain life insurance, appellee contends that he will only be able to secure life insurance through his employer until he retires, and thereafter appellant will have a claim against his estate.

{¶ 55} At trial, appellee testified that he holds a term life insurance policy through his employer, with a face value of $800,000. However, appellee indicated that, as a commercial airline pilot, he is subject to the mandatory retirement age of 65 years old

25.

under regulations promulgated by the Federal Aviation Administration. Since he was born in December 1957, appellee will be forced to retire no later than December 2022. As to whether he would be entitled to retain his employer-provided term life insurance during his retirement, appellee testified, "I don't really know."

{¶ 56} On this record, it is unclear whether the potentiality of which appellee complains, namely that appellant would have a claim against his estate, will ever arise. Appellee's testimony reveals a lack of knowledge on his part as to whether he may retain life insurance through Delta Airlines while in retirement.

{¶ 57} Additionally, appellee's argument is premised upon the erroneous assumption that the trial court's spousal support award is "not subject to modification." Indeed, the trial court indicated in its decision that "spousal support shall continue subject to earlier termination upon [appellant's] death, remarriage or cohabitation with another as if married without the benefit of ceremony, *or further order of the Court*, whichever occurs first." (Emphasis added.) The trial court's inclusion of the phrase "further order of the Court" retains the trial court's jurisdiction to modify the amount or terms of the spousal support under R.C. 3105.18(E)(1). *Kirkwood v. Kirkwood*, 1st Dist. Hamilton No. C-950940, 1996 WL 496947, *2 (Sep. 4, 1996). Given this reservation of jurisdiction, appellee may petition the trial court for a modification to the terms of its spousal support award in the event that his life insurance is terminated upon retirement.

26.

{¶ 58} In light of the foregoing, we find that the trial court did not abuse its discretion in ordering appellee to pay indefinite spousal support to appellant. Accordingly, appellee's first assignment of error is not well-taken.

### D. Marital Debt

{¶ 59} In her fifth and final assignment of error, appellant argues that the trial court erred in ordering each party to pay their own debt and hold the other harmless thereon.

{¶ 60} A trial court has broad discretion in dividing marital property in an action for divorce, and such decisions are reviewed for an abuse of discretion. *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982).

{¶ 61} R.C. 3105.171 governs the division of marital property in a divorce action. Under R.C. 3105.171(B) and (C)(1), marital property is to be divided equally unless an equal division would be inequitable, in which case marital property is to be divided in an equitable manner. In making a division of marital property, the court is required to consider all relevant factors, including those listed in R.C. 3105.171(F).

{¶ 62} The court must consider both the parties' assets and the parties' liabilities when dividing marital property under R.C. 3105.171(F)(2), and "'an equitable division of marital property necessarily implicates an equitable division of marital debt.'" *Meifert v. Meifert*, 6th Dist. Lucas No. L-13-1192, 2015-Ohio-801, ¶ 33, quoting *Elliott v. Elliott*, 4th Dist. Ross No. 03CA2737, 2004-Ohio-3625, ¶ 12. "[W]hile the starting place for an equitable property division is an equal assignment of marital debt and marital assets, after

27.

considering all the relevant factors in a case, a trial court may choose to award one party more of the marital debts or marital assets and still have an equitable order." *Stacey v. Stacey*, 6th Dist. Lucas No. L-00-1079, 2001WL 336471, *8 (Apr. 6, 2001), citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981), paragraph one of the syllabus.

{¶ 63} In its decision and judgment entry of divorce, the trial court in the present case relied upon the affidavits filed by the parties to determine the total debt of each party, ultimately finding that appellant's total debt amounted to $61,365 and appellee's total debt amounted to $95,000 excluding mortgages and automobile loans. Thereafter, the court stated:

> Giving due consideration to the nature of the marital debt, the
> duration of the marriage, the [appellee's] responsibility during the marriage
> to maintain the family home and the children, and the income of each party
> following the payment and receipt of spousal support, the Court finds it
> equitable that each party be responsible for their own individual debt and
> hold the other harmless therefrom.

{¶ 64} In support of her contention that the trial court erred in dividing the parties' marital debt, appellant asserts that the trial court misapplied the law by indicating that marital debt should be *equally* divided, when in fact the law requires that the debt be divided *equitably*. A review of the trial court's decision belies appellant's assertion. As noted by appellee in his brief to this court, it is clear from the language contained in the

28.

trial court's decision that the trial court's aim in dividing the marital debts was to do so equitably, not equally. The trial court expressly stated this goal, and then fashioned a division that is not equal by attributing more marital debt to appellee ($95,000) than it did to appellant ($61,365).

{¶ 65} Additionally, appellant contends that the trial court erred in treating appellee's $25,000 loan to himself from his 401(k) as his marital debt, since appellee, in repaying that debt, will be paying himself. Excluding this $25,000 loan from appellee's marital debt, the fact remains that the trial court attributed more debt to appellee than it did to appellant. Moreover, the trial court indicated its consideration of the relevant R.C. 3105.171(F) factors in arriving at what it deemed an equitable division of marital debt. Appellant does not assert that the trial court failed in its application of these factors to this case.

{¶ 66} In this section of her brief, appellant also contends that "the trial court ignored the fact [that appellant's] total debt through these proceedings exceeded $120,000 and she had to use approximately $62,000 of the interim property division to pay down her indebtedness." Notably, the $62,000 in debt attributable to appellant was no longer outstanding at the time of the trial court's division of marital debt. Therefore, it was no longer marital debt subject to division, and the trial court did not abuse its discretion in failing to treat it as such.

{¶ 67} While appellant's $62,000 payment during the pendency of the divorce may be relevant to the trial court's division of marital property (which appellant does not

29.

challenge) or spousal support award, or may form the basis for a request for a distributive award, it does not call into question the trial court's division of marital debt.

{¶ 68} Given the trial court's attempt to fashion an equitable division of marital debt upon consideration of the relevant factors under R.C. 3105.171(F), we find that the trial court did not abuse its discretion in dividing the parties' martial debts and assigning a greater portion of such marital debt to appellee in this case. Accordingly, appellant's fifth assignment of error is not well-taken.

### E. Payment for Children's Private Schooling (cross assignment II)

{¶ 69} In appellee's second assignment of error on cross-appeal, he argues that the trial court abused its discretion in ordering him to continue to pay for J.R.'s private school tuition without conditioning such orders upon his future financial circumstances. Appellee does not challenge the trial court's appointment of appellant as the parent responsible for deciding where to send J.R. to school, nor does he argue that the trial court erred in ordering him to pay the tuition for such schooling. Nonetheless, appellee argues that the trial court's unconditional order to pay J.R.'s tuition, paired with appellant's authority to make unilateral decisions regarding where J.R. attends school, gives appellant the unfettered ability to financially bind appellee to pay whatever private school tuition she deems appropriate for J.R.

{¶ 70} At trial, a parenting plan was prepared by the children's guardian ad litem. Under this parenting plan, S.R. would remain in the Perrysburg school system and J.R. would remain at Saint Rose School until high school, at which point he would attend

30.

school in the Perrysburg public school system. The parenting plan, which was adopted by the trial court and incorporated into its decision and judgment entry of divorce, provides: "The parties agree that [J.R.] will remain at St. Rose. Once he has completed eighth grade, [J.R.] shall attend Perrysburg school system *unless otherwise agreed*." (Emphasis added.) Both parties indicated their consent to this arrangement during their testimony at trial. Appellee testified that the yearly cost of tuition for J.R.'s private schooling is $4,000. In his reply brief to this court, appellee acknowledges that he "does not object to paying [J.R.'s] tuition at St. Rose."

{¶ 71} Under the express terms of the parenting plan, appellee is obligated to continue to pay J.R.'s tuition while he attends private school at Saint Rose School. Upon entering high school, J.R. will begin to attend public school, and appellee will no longer be responsible for paying for tuition. Contrary to appellee's contention, decisions regarding J.R.'s schooling are not within the exclusive purview of appellant, because the parenting plan sets forth an arrangement that may only be modified with agreement from both appellant *and* appellee. Appellee's concern that appellant may enroll J.R. in an expensive private school without his approval is both wholly speculative and subject to challenge under the trial court's decision and judgment entry of divorce. Therefore, we find no merit to appellee's contention that the trial court's order delegates its judicial function to appellant and permits her to impose an "indefinite and potentially inequitable financial obligation on [him], without granting the accompanying opportunity to seek modification."

31.

**{¶ 72}** Accordingly, appellee's second assignment of error is not well-taken.

### III.    Conclusion

**{¶ 73}** In light of the foregoing, the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed.  The costs of this appeal are to be split among the parties under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.